OPINION
{¶ 1} Todd Carter ("Carter") appeals the October 18, 2002 judgment entry of the Portage County Court of Common Pleas denying Carter's motion to suppress. Carter further appeals the imposition of sentence in this matter. For the reasons set forth below, we affirm the decision of the trial court in this matter.
 {¶ 2} On August 12, 2002, Carter was driving on I-480 in Streetsboro, Ohio, with David Brown ("Brown"). As Carter and Brown were traveling on I-480, Patrolman Christopher Petro ("Petro") clocked the vehicle at 81 miles per hour in a 65 mile per hour zone. At approximately 4:00 a.m., Petro stopped the vehicle and approached Carter.
 {¶ 3} Petro requested Carter's license and the registration for the vehicle. As Petro was addressing Carter, Petro noticed a heavy odor of air fresheners and observed a large group of air fresheners attached to the driver's side door.[1] Petro also observed a cell phone in the center console and a backpack at the feet of Brown.
 {¶ 4} Petro obtained identification from both Carter and Brown. Upon doing so, Petro observed that the state of origin of Carter's license was California while the state of origin for Brown's identification was New York. Petro proceeded back to his vehicle to conduct a LEADS check on the occupants. Petro learned that the identifications were valid and neither occupant had any active warrants. Petro also learned that Carter had prior drug convictions.
 {¶ 5} At this time, Petro attempted to contact a drug dog to have a drug sniff conducted on the vehicle. He learned, however, that no drug dog was available. Petro returned to question Carter. In doing so, he asked Carter to exit the vehicle. Carter informed Petro that Carter had just picked up Brown from the Cleveland airport, Brown was traveling from California, and that they were returning to Youngstown. Carter further informed Petro that Brown was only staying for the weekend. After questioning Carter, Petro addressed Brown. Petro noticed a conflict in their stories regarding the extent of Brown's visit.
 {¶ 6} As part of a drug interdiction policy, Petro then re-addressed Carter. Petro asked Carter if there were any weapons in the vehicle. Carter denied such presence of weapons. Petro then asked if there was any contraband in the vehicle. Again, Carter denied the existence of any contraband. Finally, Petro asked whether there were any drugs in the vehicle. Carter denied the presence of drugs, but, in doing so, Petro observed Carter exhibiting signs of nervousness.
 {¶ 7} Petro proceeded to seek permission to search Carter's vehicle. Carter consented. Petro searched the interior of the vehicle without success. Petro then proceeded to search the trunk and discovered a large cardboard box. Petro opened the box and noticed another box. Upon opening the second box, Petro found a third box. When asked what was in the third box, Carter replied that he did not know since the box did not belong to him, but, instead, belonged to his cousin, Mark Smith.[2] The officer opened this third box to reveal what was later discovered to be 2.25 kilograms of cocaine.
 {¶ 8} As Petro was opening this box, Carter and Brown became extremely nervous and ran from the scene. They were both eventually apprehended. Carter was indicted on August 15, 2002, on possession of cocaine and trafficking in cocaine.
 {¶ 9} Carter filed a motion to suppress on September 12, 2002. The court held a hearing on this motion on October 11, 2002. On October 18, 2002, the court denied Carter's motion. In doing so, the court found that Petro had reason to effectuate the initial stop of the vehicle. The court further found that, based on the presence of air fresheners, the cell phone and the backpack, the knowledge of Carter's prior drug convictions, the fact that Carter was from California and was transporting someone who had just come from California, a known source of drugs, the conflicting stories, and the nervousness exhibited by Carter, Petro had a reasonable suspicion to detain Carter further. Thus, the court found, that Carter was properly detained when Petro asked for consent to search the vehicle.
 {¶ 10} The court then determined that because Carter failed to proffer any indication that his consent was coerced, Carter's consent to the search was voluntary. The court, therefore, overruled Carter's motion to suppress.
 {¶ 11} Carter proceeded to enter a no contest plea to count one as amended. The second count was nolled. On December 16, 2002, the court stated the following at the sentencing hearing:
 {¶ 12} "The Court for the record has read the probation report. * * *
 {¶ 13} "The Court would further find this is a mandatory jail sentence. The Court would further find, for the record, in balancing the more serious factors, the less serious factors, the Court would find that he did have in his possession a large amount of cocaine, over two kilos.
 {¶ 14} "The Court would further find he has a prior record of drug offenses.
 {¶ 15} "The Court would further find he has had probation revoked.
 {¶ 16} "The Court would further find for the record that he has served a prior prison term.
 {¶ 17} "In balancing all these factors, [it] will be the sentence of this Court that you be confined by the Ohio Department of Corrections for a period of eight years, that you be credited any time served."
 {¶ 18} In its December 19, 2002 judgment entry imposing the eight year sentence, the court stated as follows:
 {¶ 19} "The Court has considered the record, oral statements, any victim impact statement and presentence report prepared, as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors under Ohio Revised Code Section 2929.12.
 {¶ 20} "* * *
 {¶ 21} "For reasons stated on the record, and after consideration of the factors under Revised Code 2929.12, the Court also finds that prison is consistent with the purposes of Revised Code Section 2929.11 and the Defendant is not amenable to community control sanction.
 {¶ 22} "* * *
 {¶ 23} "The Court finds prison is mandatory for this offense and the Defendant has served a prior prison term."
 {¶ 24} Carter timely appealed and raises the following assignments of error:
 {¶ 25} "[1.] The trial court erred to the prejudice of the defendant[-]appellant when it overruled his motion to suppress the evidence obtained as a result of an illegal detention and search.
 {¶ 26} "[2.] The trial court erred in imposing an eight year prison sentence upon the defendant-appellant."
 {¶ 27} In his first assignment of error, Carter argues that the articulable facts relied upon by Petro do not give rise to a reasonable suspicion of criminal activity. Thus, Carter asserts, since his continued detention beyond the purposes of the initial stop was unlawful, his consent was not valid and the motion to suppress should have been granted.
 {¶ 28} The trial court acts as trier of fact at a suppression hearing and must weigh the evidence and judge the credibility of the witnesses. State v. Hill, 75 Ohio St.3d 195, 208,1996-Ohio-222 (citation omitted). Since the trial court is in the best position to resolve the factual issues, State v. Searls
(1997), 118 Ohio App.3d 739, 741, citing State v. Mills (1992),62 Ohio St.3d 357, 366, an appellate court is bound to accept the trial court's factual determinations as long as they are supported by competent and credible evidence. Searls,118 Ohio App.3d at 741. Once the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts. Id.
 {¶ 29} Upon review of the record, we find that the trial court's factual determinations are supported by competent and credible evidence. Thus, this court must accept these factual findings as accurate, and we now must "independently determine as a matter of law whether the applicable legal standard has been satisfied." See State v. Burrows, 11th Dist. No. 2000-T-0089, 2002-Ohio-1961, 2002 Ohio App. LEXIS 1918, at *8, citing Statev. Retherford (1994), 93 Ohio App.3d 586, 592.
 {¶ 30} The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." The Fourth Amendment is enforceable against the states through the Due Process Clause of the Fourteenth Amendment. Mappv. Ohio (1961), 367 U.S. 643, 655.
 {¶ 31} The "capacity to claim the protection of theFourth Amendment depends * * * upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois (1978),439 U.S. 128, 143, citing Katz v. U.S. (1967), 389 U.S. 347, 353. A person who denies ownership of an item does not possess an expectation of privacy in the item to which he or she disclaimed ownership, see United States v. Tolbert (C.A. 6, 1982),692 F.2d 1041, 1045; United States v. Cofield (C.A. 11, 2001),272 F.3d 1303, 1306 ("an individual who * * * denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police"), and, thus, the item is considered abandoned. See United States v. Medina-Mojica (C.A. 6, 1999), 1999 U.S. App. LEXIS 26436, at *9 (citation omitted) ("an express denial of disclaimer of ownership in a piece of baggage constitutes an abandonment that results in a lack of standing to challenge a search"); State v. Fields (Feb 1, 1996), 8th Dist. No. 68906, 1996 Ohio App. LEXIS 335, at *12-*13. "[A]n unconstitutional seizure * * * which prompts a disclaimer of property[, however,] vitiates" the denial of ownership.Tolbert, 692 F.2d at 1045; see, also, United States v.Nicholson (C.A. 10, 1998), 144 F.3d 632, 640 ("Because any abandonment was a direct consequence of the detectives'Fourth Amendment violation in initially handling Defendant's luggage without a warrant, we deem such abandonment involuntary as a matter of law.").
 {¶ 32} In this case, Carter disclaimed ownership of the package in the trunk and, therefore, he may not challenge the constitutionality of the search unless the disclaimer was the result of an unconstitutional seizure. Thus, as long as Carter was lawfully detained, the resulting search did not violate his constitutional rights.
 {¶ 33} Stopping a vehicle and detaining its occupants is a seizure within the meaning of the Fourth Amendment. Delaware v.Prouse (1979), 440 U.S. 648, 653, citing United States v.Martinez-Fuerte (1976), 428 U.S. 543, 556-558. "[W]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." Dayton v.Erickson, 76 Ohio St.3d 3, 11, 1996-Ohio-431.
 {¶ 34} "[A]n officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal activity is afoot."Retherford, 93 Ohio App.3d at 600, citing United States v.Brignoni-Ponce (1975), 422 U.S. 873, 881-882; see, also, Statev. Waldroup (1995), 100 Ohio App.3d 508, 513, citing State v.Myers (1990), 63 Ohio App.3d 765, 771 ("If during the scope of the initial stop an officer encounters additional specific and articulable facts which give rise to a reasonable suspicion of criminal activity beyond that which prompted the stop, the officer may detain the vehicle and driver for as long as the new articulable and reasonable suspicion continues.").
 {¶ 35} To justify this expanded investigation, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Terry, 392 U.S. at 21. Reasonable suspicion must be viewed in light of the totality of the circumstances. State v. Bobo (1988), 37 Ohio St.3d 177, paragraph one of the syllabus. "An inarticulate hunch or suspicion is not enough. The officer must have a reasonable belief and specific facts upon which a reasonable suspicion could be based that appellant was violating or about to violate the law." State v. Dickinson (Mar. 12, 1993), 11th Dist. No. 92-L-086, 1993 Ohio App. LEXIS 1428, at *4 (citations omitted).
 {¶ 36} "[A] search conducted pursuant to a valid consent is constitutionally permissible." Schneckloth v. Bustamonte
(1973), 412 U.S. 218, 222. Whether the consent was in fact voluntary "is a question of fact to be determined from the totality of all the circumstances." Id. at 227. Consent given while unlawfully detained, even if voluntary, renders the resulting evidence inadmissible unless the consent is an "independent act of free will." Florida v. Royer (1983),460 U.S. 491, 501-502.
 {¶ 37} In this case, Carter does not claim that the initial stop was unlawful, nor does he claim that his consent was involuntary. Thus, the only issue is whether the detention was reasonably necessary to effectuate the purposes of the initial stop or whether the detention was properly expanded as supported by a reasonable, articulable suspicion that some further criminal activity was afoot.
 {¶ 38} An officer may order the driver of a properly stopped vehicle to exit his or her vehicle, even without a reasonable suspicion of criminal activity. See State v. Evans,67 Ohio St.3d 405, 407, 1993-Ohio-186, citing Pennsylvania v. Mimms
(1977), 434 U.S. 106. Moreover, an officer may detain a motorist to ask him or her questions regarding whether the motorist is carrying drugs or weapons in order to promote the public interest. State v. Robinette, 80 Ohio St.3d 234, 241,1997-Ohio-343. In order to detain a motorist beyond the contraband questions, the officer must possess a reasonable, articulable suspicion that criminal activity is afoot. Id.
 {¶ 39} In this case, Petro lawfully ordered Carter to exit the vehicle because the initial stop was proper. Further, Petro did not unlawfully detain Carter when he asked the contraband questions because the questions were the result of a drug interdiction policy promoting the public interest. Thus, any facts Petro possessed or observations made up to the conclusion of the contraband questions could be used to support his reasonable, articulable suspicion.
 {¶ 40} In supporting his reasonable suspicion that criminal activity was afoot, Petro pointed to the following facts: (1) the strong odor and observance of numerous air fresheners, (2) the presence of a cell phone in the center console, (3) Petro's knowledge of Carter's prior drug convictions, (4) Carter was from a known drug source and was picking someone up from that same drug source, (5) the conflicting stories of Carter and Brown, and (6) the nervousness exhibited by Carter when asked about the presence of drugs in his vehicle. All of these factors may support an officer's reasonable suspicion of criminal activity. See State v. Matteucci, 11th Dist. No. 2001-L-205, 2003-Ohio-702, at ¶ 31 (nervousness and conflicting responses);State v. Roye (June 22, 2001), 2nd Dist. No. 2001 CA 5, 2001 Ohio App. LEXIS 2750, at *7 (knowledge of defendant's prior record and nervousness); Warren v. Provitt (Oct. 22, 1999), 11th Dist. No. 97-T-0228, 1999 Ohio App. LEXIS 4942, at *3 (conflicting stories); State v. Earl (1997),120 Ohio App.3d 457, 472 (cell phone); State v. Melchor (1996),114 Ohio App.3d 534, 539 (air freshener, from known drug source, and conflicting stories); State v. Buck (June 28, 1995), 4th Dist. No. 94CA2048, 1995 Ohio App. LEXIS 2867, at *8 (air freshener);State v. Taylor (1995), 106 Ohio App.3d 741, 745 (from known drug source); State v. Hassey (1983), 9 Ohio App.3d 231, 236
(from known drug source and knowledge of prior involvement with drugs). Since knowledge of all these factors was obtained by Petro prior to the conclusion of the contraband questions, he could properly rely on each of them in forming his reasonable suspicion. We conclude, based upon the specific and articulable facts cited by Petro at the suppression hearing and noted above, that Petro possessed a reasonable belief that further criminal activity was afoot at the time he asked for Carter's consent to search the vehicle.
 {¶ 41} Carter was, therefore, lawfully detained when he consented to the search and when he abandoned the package in the trunk. Thus, Carter did not have an expectation of privacy in the package and he may not now challenge the constitutionality of the search of that package. See Tolbert, 692 F.2d at 1045;Cofield, 272 F.3d at 1306; Medina-Mojica, 1999 U.S. App. LEXIS 26436, at *9-*10; Fields, 1996 Ohio App. LEXIS 335, at *12-*13.
 {¶ 42} We, therefore, conclude that the trial court did not err in denying Carter's motion to suppress. Carter's first assignment of error is without merit.
 {¶ 43} In his second assignment of error, Carter argues that the trial court did not indicate "specific operative facts [to establish] that [the factors of R.C. 2929.12] were indeed considered." Thus, Carter asserts, the sentence is incomplete and invalid.
 {¶ 44} In reviewing sentencing decisions of a trial court, an appellate court conducts a meaningful review of the sentence decision. State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 10. "`Meaningful review' means that an appellate court hearing an appeal of a felony sentence may modify or vacate the sentence and remand the matter to the trial court for resentencing if the court clearly and convincingly finds that the record does not support the sentence or that the sentence is otherwise contrary to law." Id., citing R.C. 2953.08.
 {¶ 45} "A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to victim of the offense, the public, or both." R.C. 2929.11(A).
 {¶ 46} In accomplishing the purposes of R.C. 2929.11, the trial court must consider the factors enumerated in R.C. 2929.12.Comer, 2003-Ohio-4165, at ¶ 13. This consideration can be derived from the record of the sentencing hearing and/or the judgment entry imposing sentence. State v. Fisher, 11th Dist. No. 2002-L-020, 2003-Ohio-3499, at ¶ 11 (citations omitted). "The Code does not specify that the sentencing judge must use specific language or make specific findings on the record in order to evince the requisite consideration of the applicable * * * factors [of R.C. 2929.12]." State v. Arnett, 88 Ohio St.3d 208,215, 2000-Ohio-302.
 {¶ 47} In the judgment entry of sentence, the trial court specifically stated that it "balanced the seriousness and recidivism factors under [R.C.] 2929.12" and that it "consider[ed] * * * the factors under [R.C.] 2929.12." Moreover, in considering the seriousness and recidivism factors at the sentencing hearing, the trial court found that the offense was more serious because of the amount of drugs involved. The trial court further found that Carter had a prior record, previously had his probation revoked, and formerly served a prison term, all factors that a court may consider pursuant to R.C. 2929.12. Thus, the record clearly evinces that the trial court considered the requisite factors of R.C. 2929.12 in imposing the eight year prison term. We, therefore, cannot clearly and convincingly find that the record does not support the sentence or that the sentence is otherwise contrary to law.
 {¶ 48} Carter's second assignment of error is without merit.
 {¶ 49} For the foregoing reasons, we hold that Carter's assignments of error are without merit. The decision of the Portage County Court of Common Pleas is affirmed.
Judgment affirmed.
Ford, P.J., and Christley, J., concur.
[1] Carter claims in his brief that Petro could not have observed the air fresheners attached to the door from his position outside the driver's side door. However, Petro testified that as Carter "reached to get his insurance card I noticed there was a large amount of air fresheners by his left knee attached to the driver's door." Thus, there was evidence proffered that Petro observed the air fresheners prior to ordering Carter from the vehicle. Moreover, there is nothing in the record to substantiate Carter's claim that Petro was unable to observe the air fresheners attached to the door. The transcript from the suppression hearing indicates that Carter introduced a photograph into evidence. That photograph, however, was not part of the record on appeal. Regardless, as discussed in the opinion, Petro could utilize any facts or observations made up to the conclusion of his questioning of Carter outside the vehicle. At the point Petro questioned Carter outside the vehicle, Petro had already approached the passenger side of the vehicle where observation of the air fresheners would have been evident. Thus, the point in time in which Petro observed the air fresheners is irrelevant in this case.
[2] It was later determined that the vehicle was registered to Mark Smith. It was also later discovered that Mark Smith was, in fact, an alias utilized by Carter.