OPINION
{¶ 1} Appellant, Christopher T. Hale ("Hale"), appeals his conviction for having a weapon while under disability. Hale filed a motion to suppress, which was denied, entered a no contest plea, and was found guilty. He was sentenced to ninety days in jail and three years of community control sanctions.
 {¶ 2} His appeal to this court challenges the trial court's denial of his motion to suppress, and specifically, the validity of the traffic stop by the police officer and the continued detention of the vehicle in which he was a passenger. The following facts are relevant to this appeal.
 {¶ 3} Officer Thomas R. Lanning ("Lanning") of the Willoughby Hills Police Department was on general patrol at 6:47 p.m. on November 6, 2003. He was in the median strip of I-90, changing direction from westbound to eastbound, when he observed a vehicle with no apparent registration on the rear of the vehicle. Lanning then followed the vehicle eastbound on I-90 until it exited onto the I-271 split. As he was pursuing the vehicle, for a distance of approximately one-quarter of a mile, he observed the driver's side tires completely cross over the left line immediately adjacent to the left berm and observed that they did so three times. Lanning drove closer to the vehicle and observed that the vehicle had a temporary tag on the ledge of the rear window, but that it had fallen down. The temporary tag was not immediately observable without getting close to the vehicle. The driver was later identified as Marvin Scott ("Scott").
 {¶ 4} Lanning continued to pursue the vehicle and stopped it for the marked lanes violation. Lanning signaled to the driver to pull over, and the driver thereupon crossed over two lanes, pulling onto the right berm of I-271 southbound. For traffic safety reasons, the officer approached the vehicle from the passenger's side and requested license and proof of insurance from Scott. Scott handed his license and proof of insurance past Hale, who was a passenger in the front seat at that time. Scott anticipated the reason for the traffic stop, and said "you couldn't see my license plate," to which the officer replied that, while it was true he was unable to observe a rear plate, Scott's weaving was the actual reason for the stop. Scott told the officer that "he was sorry he was talking to his friend and didn't realize he was weaving."
 {¶ 5} While Lanning was discussing the reason for the stop with Scott, he observed some air fresheners on the rearview mirror and smelled the odor of marijuana. He then went back to his patrol car and checked on the validity of Scott's license and called for backup. The driver's license proved to be valid, and Lanning wrote a warning citation to Scott for the marked lanes violation.
 {¶ 6} Upon returning to Scott's vehicle to give him back his license, proof of insurance, and the warning citation, Lanning asked Scott to exit the vehicle and asked him for permission to search the vehicle. Lanning explained to Scott that, because of the smell of marijuana, he was concerned about illegal activity while operating the vehicle. Scott refused permission to search the vehicle, but Lanning advised him that he would search the vehicle because of the smell of marijuana. Lanning asked Scott if he had been smoking marijuana in the vehicle, and Scott denied that he had, but said that someone had been smoking in the vehicle two days prior. Lanning also patted Scott down for weapons and found none.
 {¶ 7} After this second encounter with Scott, it was then that Lanning had contact with Hale. Lanning approached the driver's side of the vehicle. Hale was out of the vehicle at that point. Lanning testified as follows as to what happened next:
 {¶ 8} "I asked him to approach. I told him he wasn't, I told him I smelled the odor of marijuana about the vehicle I was going to conduct a search of the vehicle. I asked him if he had anything, anything that would prick me or blow me up. He readily admitted that he did have a pistol in his waistband. At that point I cuffed him and removed the Cobra 38 snub-nosed revolver from his waistband."
 {¶ 9} Hale was indicted on three counts, the first count for carrying a concealed weapon, in violation of R.C. 2923.12, a felony of the fourth degree; the second count, an additional carrying concealed weapons charge, with a specification for having previously been convicted in 1997 of carrying a concealed weapon, also a felony of the fourth degree; and a third count of having a weapon under disability, in violation of R.C.2923.13(A)(3), a felony of the fifth degree.
 {¶ 10} Hale filed a motion to suppress on the basis that Lanning did not have a sufficient basis to stop Scott's vehicle and that any evidence seized as a result of the stop should be suppressed. The trial court denied the motion.
 {¶ 11} On the same day the hearing on Hale's motion to suppress took place, but before the trial court's ruling on the motion to suppress had been filed, Hale entered into a written plea agreement with the prosecutor. In the written plea of no contest and judgment entry, Hale agreed to plea no contest to the charge of having a weapon under disability. At the request of the prosecutor, the other charges were dismissed by the trial court.
 {¶ 12} Hale received a ninety-day jail sentence and three years of community control sanctions. The sentencing order provides that if he violates his community control sanctions, he could receive more restrictive sanctions or a twelve-month prison sentence.
 {¶ 13} Hale has presented a single assignment of error for this court's review:
 {¶ 14} "The trial court erred to the prejudice of defendant-appellant by failing to grant his motion to suppress in violation of his due process rights and rights against unreasonable search and seizure pursuant to the Fourth, Fifth andFourteenth Amendments to the United States Constitution and sections 10, 14 and 16, Article I of the Ohio Constitution."
 {¶ 15} Hale has further broken down this assignment of error into two issues for our review. The first issue has to do with the initial traffic stop and whether it was valid. The second issue has to do with the detention of the vehicle after a warning citation was issued to the driver of the vehicle, which resulted in the arrest of Hale for the gun charge. Upon review, we find the initial traffic stop to be valid, the further detention of the vehicle and the arrest of Hale to be valid, and the denial of the motion to suppress by the trial court to be correct. We affirm the trial court's judgment entry for the following reasons.
 {¶ 16} "Appellate review of a motion to suppress presents a mixed question of law and fact."[1] The appellate court must accept the trial court's factual findings, provided they are supported by competent, credible evidence.[2] Thereafter, the appellate court must independently determine whether those factual findings meet the requisite legal standard.[3]
 {¶ 17} Though Hale was a passenger in the vehicle driven by Scott, he has standing to challenge the traffic stop. In Statev. Carter, the Supreme Court of Ohio held that "[b]oth passengers and the driver have standing regarding the legality of a stopping because when the vehicle is stopped, they are equally seized, and their freedom of movement is equally affected."[4]
 {¶ 18} The first prong of Hale's argument asserts that the traffic stop by Lanning was unreasonable because it involved a "minimal amount of weaving," which did not rise to the level of a traffic violation. In support of this part of his argument, he cites to various decisions of this court and another appellate district to the effect that, under a totality of the circumstances approach, a "minimal amount of weaving" does not justify a traffic stop.[5] However, for the reasons that follow, we hold that an officer may stop a motor vehicle, after witnessing a traffic violation, including a marked lanes violation.
 {¶ 19} The relevant statute, known as a marked lanes violation, provided:
 {¶ 20} "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:
 {¶ 21} "(A) A vehicle or trackless trolley shall be driven, as nearly as practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety."[6]
 {¶ 22} Appellant directs this court's attention to the line of cases, referred to above, which would quantify the marked lanes violation in terms of being minimal, or being substantial, in order to determine whether a marked lanes violation has taken place and, therefore, whether the police officer has a legal basis for the stop.
 {¶ 23} At this point, we emphasize that the traffic stop in the instant case was based upon probable cause to make the traffic stop and not upon reasonable suspicion to make an investigative stop. The difference is important in terms of our analysis and appellate review.
 {¶ 24} The cases cited by appellant do discuss whether the weaving in question is minimal or substantial.[7] The touchstone for analysis in those cases is whether the totality of the circumstances warrants a finding that the stop was reasonable.[8] Where, however, as in the instant case, there exists probable cause for a traffic stop, the reasonableness of the stop is fulfilled by the probable cause for the stop. The circumstance of probable cause to make the stop dictates that the stop was reasonable on its face. No further quantifying of the basis for the stop is necessary where probable cause for the stop exists. An analysis of a different line of cases from that suggested by appellant makes clear the efficacy of probable cause in determining whether a stop was reasonable.
 {¶ 25} Our analysis begins with the United States Supreme Court in the case of Whren v. United States:
 {¶ 26} "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons' within the meaning of [the Fourth Amendment]. * * * An automobile stop is thus subject to the constitutional imperative that it not be `unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[9]
 {¶ 27} That court went on to explain that:
 {¶ 28} "[I]n principle every Fourth Amendment case, since it turns upon a `reasonableness' determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause."[10]
 {¶ 29} Within weeks of that decision by the United States Supreme Court, the Supreme Court of Ohio made a like decision with respect to traffic stops in the case of Dayton v.Erickson, in which it adopted the holding of the Sixth Circuit Court of Appeals and approved of the following language:
 {¶ 30} "`We hold that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment. * * * The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop.'"[11]
 {¶ 31} The Supreme Court of Ohio went on to hold in theDayton v. Erickson case that:
 {¶ 32} "Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under theFourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity."[12]
 {¶ 33} The following year, the Supreme Court of Ohio reviewed a case from the Twelfth District, wherein the arresting officer had observed the defendant's passenger-side tires cross the right edge line three times, each time only one or two inches over the edge line. The Twelfth District had concluded that the marked lanes statute only required a driver to stay within a single lane "as nearly as practicable."[13] In a one-sentence opinion, the Supreme Court of Ohio reversed, on the authority of Daytonv. Erickson.[14]
 {¶ 34} Another appellate court has stated that "Ohio's `marked lanes' statute requires a driver to remain in a single lane `as nearly as is practicable.' In this context, the word `practicable' means `performable, feasible or possible.'"[15] The court in the State v. Hodge case gave a further explanation to the phrase "as nearly as is practicable:"
 {¶ 35} "The legislature did not intend for a motorist to be punished when road debris or a parked vehicle makes it necessary to travel outside the lane. Nor, we are quite certain, did the legislature intend this statute to punish motorists for traveling outside their lane to avoid striking a child or animal. We are equally certain that the legislature did not intend to give motorists the option of staying within their lane at their choosing. Common sense dictates that the statute is designed to keep travelers, both in vehicles and pedestrians, safe. The logical conclusion is that the legislature intended only special circumstances to be valid reasons to leave a lane, not mere inattentiveness or carelessness. To believe that the statute was intended to allow motorists the option of when they will or will not abide by the lane requirement is simply not reasonable."[16]
 {¶ 36} Thus, from the above authorities, we can clearly state, as the court in Dayton v. Erickson stated, that the stop of a vehicle by a police officer where a "traffic violation has occurred or was occurring" is not unreasonable under theFourth Amendment.[17] In point of time, therefore, the subject violation has already occurred. We can also agree with the court in State v. Hodge that the legislature did not intend to give drivers the "option" whether to stay within a marked lane,[18] and that "[f]or the run-of-the-mill case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure."[19]
 {¶ 37} In the instant case, Lanning first noticed that Scott's vehicle did not appear to have registration on the rear of the vehicle. This gave him reasonable suspicion to pursue the vehicle. During his pursuit, Lanning observed a temporary tag on the rear window ledge as he got closer to the vehicle. He also observed Hale's driver (Scott) commit a marked lanes violation when he crossed over the white lane marker three times while making his approach onto I-271. When that happened, Lanning had probable cause to stop Scott's vehicle for a traffic violation. While there was discussion with Scott and Hale about searching the vehicle because Lanning smelled the odor of marijuana, the record before us does not demonstrate that any consequences flowed from a search, if any, of the vehicle for marijuana. There is no need under such circumstances to engage in a reasonable suspicion analysis where the driver was stopped for a traffic violation that had already occurred. Therefore, the stop of the vehicle by Lanning was valid.
 {¶ 38} The second prong of Hale's argument is that the continued detention of the vehicle and its occupants after the warning citation had been issued to the driver was unlawful. He argues that the authority of a police officer to detain an individual ceases once he no longer believes a law has been violated, citing as his authority State v. Chatton and Statev. Frye.[20]
 {¶ 39} The record demonstrates, however, that although the initial purpose for the stop came to an end when the police officer issued a warning citation to Scott for weaving, other circumstances came to the officer's attention during the stop to justify his continued investigation.
 {¶ 40} "[I]f circumstances attending an otherwise proper stop should give rise to a reasonable suspicion of some other illegal activity, different from the suspected illegal activity that triggered the stop, then the vehicle and the driver may be detained for as long as that new articulable and reasonable suspicion continues * * *."[21]
 {¶ 41} Specifically, on first contact with the occupants in the vehicle, Lanning noticed the smell of marijuana. He also noticed several air fresheners hanging from the rearview mirror which, based on his training and experience, he knew to be indicators of illegal activity. Furthermore, the driver himself admitted that marijuana had been smoked within the vehicle two days prior to the stop. This was not enough to allay the officer's concern that illegal drug activity was in progress. Lanning still had the authority to search and inquire further based upon his reasonable suspicion that drug activity was in progress.[22]
 {¶ 42} Where there is a valid traffic stop, the police officer's initial smell of the odor of burnt marijuana emitting from a person's vehicle is "sufficient to establish probable cause to search a motor vehicle, pursuant to the automobile exception to the warrant requirement."[23] The court inState v. Moore went on to hold that not only was the search of the automobile justified, but also the search of the person was justified on the basis of exigent circumstances.[24] If the search of the person is justified under such circumstances, then it logically follows that Lanning was justified in making the inquiry of Hale to protect his personal safety. Such contact was less intrusive than an actual search of Hale's person and is validated by Terry v. Ohio.[25]
 {¶ 43} Hale's assignment of error is without merit.
 {¶ 44} The judgment of the trial court is affirmed.
Ford, P.J., O'Toole, J., concur.
[1] State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8.
[2] State v. Guysinger (1993), 86 Ohio App.3d 592, 594.
[3] State v. Thompson (July 27, 2001), 11th Dist. No. 2000-T-0096, 2001 Ohio App. LEXIS 3356, at *5.
[4] (Citations omitted.) State v. Carter (1994),69 Ohio St.3d 57, 63.
[5] State v. Dwyer (Feb. 22, 2002), 11th Dist. No. 2001-L-075, 2002 Ohio App. LEXIS 774; State v. Haley (Mar. 16, 2001), 11th Dist. No. 2000-P-0021, 2001 Ohio App. LEXIS 1242; State v.Worthy (Dec. 1, 2000), 11th Dist. No. 99-L-063, 2000 Ohio App. LEXIS 5612; Willoughby v. Mazura (Sept. 30, 1999), 11th Dist. No. 98-L-012, 1999 Ohio App. LEXIS 4642; State v. Spikes (June 9, 1995), 11th Dist. No. 94-L-187, 1995 Ohio App. LEXIS 2649;State v. Gullett (1992), 78 Ohio App.3d 138.
[6] R.C. 4511.33(A). (Statute has been renumbered since the date of Hale's offense.)
[7] State v. Dwyer, supra, at *9-10; State v. Haley, supra, at *4-5; State v. Worthy, supra, at *3-4; Willoughby v.Mazura, supra, at *8-12; State v. Spikes, supra, at *9-10.
[8] State v. Gullett, 78 Ohio App.3d at 145.
[9] (Citations omitted.) Whren v. United States (1996),517 U.S. 806, 809-810.
[10] Id. at 817.
[11] Dayton v. Erickson (1996), 76 Ohio St.3d 3, at 9-10, quoting United States v. Ferguson (C.A.6, 1993), 8 F.3d 385,388.
[12] Dayton v. Erickson, syllabus.
[13] State v. Wilhelm (Apr. 14, 1997), 12th Dist. No. CA96-12-272, 1997 Ohio App. LEXIS 1457, at *4.
[14] State v. Wilhelm (1998), 81 Ohio St.3d 444.
[15] State v. Schwieterman, 2d Dist. No. 1588, 2003-Ohio-615, at ¶ 11, citing State v. Hodge, 147 Ohio App.3d 550,2002-Ohio-3053.
[16] (Emphasis in original.) State v. Hodge, supra, at ¶ 43.
[17] Dayton v. Erickson, supra, syllabus.
[18] (Emphasis in original.) State v. Hodge, supra, at ¶ 43.
[19] Whren v. United States, supra, at 819.
[20] State v. Chatton (1984), 11 Ohio St.3d 59; State v.Frye (1985), 21 Ohio App.3d 133.
[21] State v. Myers (1990), 63 Ohio App.3d 765, 771.
[22] State v. Carter, 11th Dist. No. 2003-P-0007,2004-Ohio-1181, at ¶ 40.
[23] (Citations omitted.) State v. Moore (2000),90 Ohio St.3d 47, 48.
[24] Id. at 53.
[25] Terry v. Ohio (1968), 392 U.S. 1.