OPINION *Page 2 
{¶ 1} Defendant-Appellant, Patrick A. Dickinson, appeals the judgment of the Paulding County Court of Common Pleas convicting him of felonious assault and kidnapping and sentencing him to an aggregate sixteen-year prison term. On appeal, Dickinson argues that he was denied effective assistance of counsel; that the trial court erred by allowing improper evidence; that the cumulative errors at trial denied him a fair trial; that the State failed to present sufficient evidence of felonious assault and kidnapping; that the verdict was against the manifest weight of the evidence; and, that the trial court erred when it imposed a non-minimum sentence. Based upon the following, we affirm the decision of the trial court.
 {¶ 2} In February 2008, the Paulding County Grand Jury indicted Dickinson on one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree; one count of kidnapping in violation of R.C. 2905.01(B)(2), a felony of the first degree; and, one count of attempted murder in violation of R.C. 2903.02(B) and 2923.02, a felony of the first degree.[1] The indictment arose from an incident during which Dickinson allegedly beat his estranged wife, Rebeca Dickinson, with a baseball bat and refused to allow her to leave his trailer for several days. Thereafter, Dickinson entered a plea of not guilty to all counts in the indictment. *Page 3 
 {¶ 3} In April 2008, the case proceeded to jury trial, at which the trial court dismissed the attempted murder count at the State's request. Thereafter, the following testimony was heard.
 {¶ 4} Rebeca testified that on January 13, 2008, she called her estranged husband, Dickinson, and asked him to pick her up from her friend's house because she needed a place to stay; that she was not injured when Dickinson came to pick her up; that Dickinson drove her back to his trailer, where she spent the night; that, the next morning, Dickinson picked up a baseball bat and said "I have to do this * * * I planned on doing this" and proceeded to strike her with the bat (trial tr., p. 91); that, as he struck her, Dickinson told her, "you're going to die" (Id.); that she attempted to escape through the back door, but Dickinson began to "slam" the back of her head with the baseball bat; that Dickinson struck her with the bat approximately forty-three times in her head, thighs, leg, hands, arms, shoulders, and back; that Dickinson repeatedly asked her, "are you dead yet?" (Id. at 102); that her hands and arms hurt and her head was bleeding; that, at some point, she passed out on the floor; that, when she awoke, Dickinson had moved her into an armchair in the back bedroom of the trailer; that she was in "agonizing pain," and her hands were swollen and purple; that Dickinson told her she could not go into the front room; that he told her, if she left the trailer, "he'd definitely finish the job," which she believed meant he would kill her (Id. at 109); that Dickinson *Page 4 
unhooked the phone so that she could not call for help; that Dickinson would not let her leave the trailer on January 15 or 16 either, threatening to "finish the job"; that, the afternoon of January 17, Dickinson left the trailer to attend a court hearing because he had been charged with animal cruelty; that she could not put on her shoes because her hands were so swollen, but she was able to open the trailer door by pushing against it with her hip and walked to the neighbors' house for help; that she then walked to a convenience store where she asked the cashier to call the police and an ambulance; that she was transported to a hospital where her arms were stapled and put into casts; that she underwent surgery to have rods put into both of her wrists; and, that she still could not pick up anything heavy with her hands, was in constant pain, and could not close her left hand.
 {¶ 5} Rebeca continued that the couple had not been arguing or had any confrontation the day Dickinson beat her; that she never touched a frying pan or attempted to strike him with one; that she had no drugs in her possession at the trailer and had not been using drugs; and, that she had previously reported Dickinson for domestic violence against her shortly after they were married.
 {¶ 6} Deputy Shane Dyson of the Paulding County Sheriff's Office testified that on January 17, 2008, he responded to a call at a convenience store that a woman was at the store who had been beaten and claimed that someone had tried to kill her; that the woman, Rebeca, was visibly upset and crying; that her *Page 5 
hands and arms were swollen and she had blood in her hair; that she said her husband had assaulted her with a baseball bat; that her hands were so swollen and injured she could not hold a pen in either hand to sign a statement; that he searched Dickinson's trailer and discovered stains on the floor that looked like blood, a bloody blanket on a pullout bed, a chair in the back bedroom with blood soaked through the headrest, and a wooden baseball bat behind a TV stand; that he viewed Dickinson's vehicle and the passenger seat did not show any blood stains; that he locked the wooden baseball bat in the chief deputy's office and it was later placed by the chief deputy in the evidence room; that, later that day, he interviewed Dickinson; that Dickinson told him that he hit Rebeca one time with the baseball bat to defend himself because she was attempting to hit him with an iron skillet; that Dickinson claimed Rebeca was already beaten and injured when he picked her up; and, that a baseball bat is a deadly weapon.
 {¶ 7} Captain Jason Landers of the Paulding County Sheriff's Office testified that he investigated the incident and interviewed Rebeca in the hospital; that Rebeca was heavily medicated and "in and out" of consciousness, but he believed she was coherent for the most part; and, that Rebeca told him she was struck twenty-three times with the baseball bat in her arms and head.
 {¶ 8} Dickinson testified that he and Rebeca had been living separately since one week after they had married because "she put [him] in jail the first time" *Page 6 
(Id. at 208); that Rebeca called him often while they were separated because she had no place to stay; that the evening of January 13, 2008, Rebeca called him and asked him to pick her up because someone had beaten her and she had no place to go; that he picked her up at a gas station and saw that she was badly injured with blood in her hair and bruised arms and hands; that he offered to take her to the hospital, but she refused because she was on probation and was afraid she would be tested for drugs; that he "cleaned her up a bit" and washed her clothes for her; that the next day, he found her with a glass pipe and a baggie of crack cocaine in her hand; that he threw the pipe out into the weeds and flushed the baggie down the toilet; that Rebeca became very angry and swung a heavy, cast-iron frying pan at him; that he picked up a baseball bat and warned her to put down the frying pan, but she swung it at him again and struck him in the shoulder; that he was afraid, so he swung the baseball bat and knocked the frying pan out of her hand; that he only hit her hand once and did not hit her anywhere else; that she fell to her knees and begged him to let her stay at the trailer and promised she would not try to harm him again; that he did not restrain her from leaving the trailer or threaten to kill her; and, that he left the trailer multiple times over the next several days to buy cigarettes. Additionally, Dickinson identified the wooden baseball bat as his and stated that he kept it in the trunk of his car or in his trailer because Rebeca had threatened to "have somebody rough [him] up." (Id. at 225). *Page 7 
 {¶ 9} Dickinson further testified that there were no blood stains on the passenger seat even though Rebeca's head had been bleeding the night he picked her up; that the cast-iron frying pan weighed between five to eight pounds; that, even though her hands were injured, Rebeca picked up the heavy frying pan and swung it at him six or seven times; that, although she struck his shoulder with the frying pan, he sustained no visible injury; that, when Rebeca sat in the chair in his trailer, she left blood stains on it from her head wounds; and, that the red stain on the carpet was probably SpaghettiOs ® sauce and not blood.
 {¶ 10} Joe Hopkins testified that Dickinson was his neighbor; that, on January 17, 2008, he saw Rebeca coming from the trailer; that her arms and hands were swollen and yellow, "she barely could walk," and "she had a big old gash in her head" (Id. at 141); that Rebeca was not wearing shoes even though it was cold and there was snow on the ground; that she appeared to be in a "state of shock" (Id. at 143); that his daughter gave Rebeca some shoes and put them on her feet because she could not do it herself; and, that Rebeca told them that Dickinson tried to kill her.
 {¶ 11} Amanda Hopkins testified that she and her father encountered Rebeca on January 17, 2008, and that Rebeca told her that Dickinson had beaten her with a baseball bat and that she was scared and had to get away before he returned home. *Page 8 
 {¶ 12} Anthony Ferchau testified that he was a forensic scientist at the Bureau of Criminal Identification and Investigation ("B.C.I."); that he analyzed the baseball bat with which Dickinson purportedly struck Rebeca; and, that he identified stains on the bat as blood.
 {¶ 13} Gabriel Feltner, a forensic scientist at B.C.I., testified that he analyzed samples taken from the baseball bat and determined that DNA from both Dickinson and Rebeca was present.
 {¶ 14} Dr. Mark Kaminsky testified that he reviewed films of Rebeca's injuries and determined that she sustained multiple fractures to her fingers, hands, and forearms.
 {¶ 15} Dr. David Goertzen testified that he treated Rebeca's injuries; that those types of injuries may cause stiffness and arthritis in the joints; and, that her injuries were consistent with blunt-force trauma.
 {¶ 16} Thereafter, the jury returned a verdict finding Dickinson guilty of felonious assault and kidnapping as charged.
 {¶ 17} In May 2008, the trial court sentenced Dickinson to a seven-year prison term on the felonious assault count and a nine-year prison term on the kidnapping count, to be served consecutively for an aggregate sixteen-year prison term. *Page 9 
 {¶ 18} It is from this judgment that Dickinson appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I APPELLANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HE WAS PREJUDICED AS A RESULT.
 Assignment of Error No. II THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING IMPROPER EVIDENCE OF OTHER ACTS THAT WERE PREJUDICIAL TO APPELLANT.
 Assignment of Error No. III DUE TO THE CUMULATIVE ERRORS COMMITTED AT TRIAL, APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
 Assignment of Error No. IV THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE OF EACH AND EVERY ELEMENT OF KIDNAPPING IN VIOLATION OF OHIO REVISED CODE SECTION 2905.01(B)(2) AND OF FELONIOUS ASSAULT IN VIOLATION OF OHIO REVISED CODE SECTION 2903.11(A)(2) FOR A JURY TO FIND THAT APPELLANT COMMITTED THOSE CRIMES BEYOND A REASONABLE DOUBT.
 Assignment of Error No. V THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. *Page 10 
 Assignment of Error No. VI THE TRIAL COURT ERRED WHEN IT IMPOSED MORE THAN THE MINIMUM SENTENCE.
 Assignment of Error No. I {¶ 19} In his first assignment of error, Dickinson argues that he was denied effective assistance of counsel and was prejudiced as a result. Specifically, Dickinson contends that his counsel was ineffective for failing to object to the admission of "prior acts" evidence, including a prior domestic violence incident and animal cruelty charge; for failing to request a limiting instruction to forbid the jury from using this "prior acts" evidence as evidence of Dickinson's propensity to commit violent crimes; for stipulating to the chain of custody on the baseball bat because it spent an undetermined amount of time in the chief deputy's office; and, for failing to file a motion to suppress statements Dickinson made to Deputy Dyson on the night of his arrest because he had not been given his Miranda rights.
 {¶ 20} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result.State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable *Page 11 
probability" is a probability sufficient to undermine confidence in the outcome of the trial. State v. Waddy (1992), 63 Ohio St.3d 424, 433, superseded by constitutional amendment on other grounds as recognized byState v. Smith, 80 Ohio St.3d 89, 103, 1997-Ohio-355.
 {¶ 21} Furthermore, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. Strickland v. Washington (1984), 466 U.S. 668; State v.Richardson, 3d Dist. No. 13-06-21, 2007-Ohio-115, citing State v.Hoffman (1998), 129 Ohio App.3d 403, 407. Tactical or strategic decisions, even if unsuccessful, generally do not constitute ineffective assistance. State v. Carter (1995), 72 Ohio St.3d 545, 558. Additionally, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance.State v. Fritz, 3d Dist. No. 13-06-39, 2007-Ohio-3138, ¶ 35, citingState v. Malone (1989), 2d Dist. No. 10564, 1989 WL 150798.
 {¶ 22} First, Dickinson argues that trial counsel was ineffective for failing to object to Rebeca's references to a prior domestic violence incident and pending animal cruelty charge, and for failing to request a limiting instruction to forbid the jury from using this "prior acts" evidence as evidence of Dickinson's propensity to commit violent crimes. However, Rebeca only briefly referred to the fact that she *Page 12 
had previously reported Dickinson for domestic violence and that he left the trailer to attend a hearing on pending animal cruelty charges, and did not elaborate on those incidents. Therefore, we cannot find that Dickinson has demonstrated a reasonable probability that, had trial counsel objected to the testimony or requested a limiting instruction, the outcome at trial would have been different. Moreover, it is plausible that trial counsel did not request a limiting instruction on this matter because he did not want the prior acts to be repeated to the jury. See State v. Yohey, 3d Dist. No. 9-95-46, 1996 WL 116144. Thus, Dickinson has failed to demonstrate that trial counsel's failure to object was not a trial strategy prompted by reasonable professional judgment.
 {¶ 23} Next, Dickinson contends that trial counsel was ineffective for stipulating to the chain of custody on the baseball bat because it spent an undetermined amount of time in the office of the chief deputy. Basically, Dickinson complains that trial counsel should have challenged the chain of custody of the bat, claiming that the presence of DNA on the bat was crucial. However, Dickinson testified at trial that he did strike Rebeca with the baseball bat, albeit in self defense. Thus, the presence of DNA on the bat was not inconsistent with Dickinson's version of events. Accordingly we cannot find that, had trial counsel challenged the chain of custody of the bat and succeeded in *Page 13 
excluding the bat and DNA evidence, the outcome of trial would have been different.
 {¶ 24} Finally, Dickinson argues that trial counsel was ineffective for failing to file a motion to suppress statements Dickinson made to Deputy Dyson on the night of his arrest because he had not been given his Miranda rights. However, the only statements Deputy Dyson testified Dickinson made were that he hit Rebeca one time with the baseball bat to defend himself because she was attempting to hit him with an iron skillet, and that Rebeca was already beaten and injured when he picked her up. Dickinson made these same statements at trial. Thus, we cannot see how, had trial counsel filed a motion to suppress the statements, the outcome of trial would have been different.
 {¶ 25} Accordingly, we overrule Dickinson's first assignment of error.Assignment of Error No. II
 {¶ 26} In his second assignment of error, Dickinson argues that the trial court committed plain error by allowing improper evidence of other acts that prejudiced him. Specifically, he contends that the trial court should not have allowed testimony regarding the prior domestic violence incident and pending animal cruelty charge, or alternately, should have given a limiting or curative instruction. Additionally, he contends that prejudice is apparent because the jury, *Page 14 
during deliberations, sent a question to the trial judge inquiring about the basis and disposition of the animal cruelty charges.
 {¶ 27} Dickinson's counsel did not object to the introduction of this testimony at trial or request a limiting or curative instruction. As such, he has waived all but plain error regarding admission of the testimony. See State v. Wegmann, 3d Dist. No. 1-06-98, 2008-Ohio-622, ¶ 106. In order to have plain error under Crim. R. 52(B), there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights."State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. Plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." State v.Biros, 78 Ohio St.3d 426, 431, 1997-Ohio-204; see State v. Johnson, 3d Dist. No. 2-98-39, 1999-Ohio-825.
 {¶ 28} Evid. R. 404(B) governs character evidence and provides that:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 29} Pursuant to Evid. R. 404(B), the admission of testimony about Dickinson's prior act of domestic violence and pending animal cruelty charges *Page 15 
was improper, and particularly in light of the jury's inquiry about the charges, the trial court should have given a limiting or curative instruction. However, we find that this error did not constitute plain error. As noted in our analysis of Dickinson's first assignment of error, these references were very brief and did not include any specific details. Additionally, Dickinson himself alluded to the prior domestic violence incident when he testified that Rebeca "put him in jail" on a prior occasion. Finally, in light of the substantial amount of evidence against Dickinson at trial, he has failed to demonstrate that, but for admission of this testimony and the trial court's failure to give a limiting or curative instruction, the outcome of the trial would clearly have been otherwise.
 {¶ 30} Accordingly, we overrule Dickinson's second assignment of error.
 Assignment of Error No. III {¶ 31} In his third assignment of error, Dickinson argues that, due to the cumulative errors during the trial, he was denied a fair trial. Specifically, he contends that he was highly prejudiced by the combined effect of the admission of evidence of a prior domestic violence incident, the admission of testimony about a pending animal cruelty charge, and the failure of trial counsel to request or the trial court to give any limiting instructions to the jury regarding these prior acts.
 {¶ 32} Under the cumulative error doctrine, "`[although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial *Page 16 
error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial.'" Wegmann, 2008-Ohio-622, at ¶ 115, quoting State v. DeMarco
(1987), 31 Ohio St.3d 191, 196-97.
 {¶ 33} In our analyses of Dickinson's first and second assignments of error, we determined that the admission of the testimony concerning the prior domestic violence incident and pending animal cruelty charge was harmless; that trial counsel's failure to request a limiting instruction on those matters was reasonable trial strategy; and, that the trial court's failure to give a limiting or curative instruction on the prior acts did not rise to the level of plain error under the facts of this case. Considering the nature of these errors, we find that their cumulative effect did not deprive Dickinson of the right to a fair trial.
 {¶ 34} Accordingly, we overrule Dickinson's third assignment of error.
 Assignment of Error No. IV {¶ 35} In his fourth assignment of error, Dickinson argues that the State failed to present sufficient evidence to sustain his convictions for kidnapping and felonious assault. Specifically, he contends that the State failed to demonstrate that he knowingly caused or attempted to cause physical harm to Rebeca; failed to demonstrate that the baseball bat was a deadly weapon; failed to prove that Rebeca was restrained of her liberty; and, failed to prove that the circumstances of the *Page 17 
alleged restraint caused her physical harm or a substantial risk of serious physical harm. We disagree.
 {¶ 36} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Monroe, 105 Ohio St.3d 384, 392, 2005-Ohio-2282, citingState v. Jenks (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in Smith, supra. Sufficiency is a test of adequacy, State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. State v. Robinson (1955),162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in Smith, supra.
 {¶ 37} Here, Dickinson was convicted of felonious assault under R.C. 2903.11(A)(2), which provides that:
 (A) No person shall knowingly do either of the following:
 * *
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.
 {¶ 38} Dickinson was also convicted of kidnapping under R.C. 2905.01(B)(2), which provides that: *Page 18 
 (B) No person, by force, threat, or deception, * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:
 * *
 (2) Restrain another of the other person's liberty;
 {¶ 39} Dickinson first argues that the State failed to demonstrate that he knowingly caused or attempted to cause physical harm to Rebeca because he claims she was injured before he picked her up and that he only struck her hand because she attempted to hit him with a heavy frying pan. However, Rebeca testified that she was not injured before going to Dickinson's trailer; that he inflicted her injuries by hitting her repeatedly with a baseball bat; and, that she never threatened Dickinson with a frying pan. Accordingly, the evidence, if believed, was sufficient to demonstrate that Dickinson knowingly caused physical harm to Rebeca.
 {¶ 40} Next, Dickinson contends that the State failed to demonstrate that the baseball bat was a deadly weapon. R.C. 2923.11(A) defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Rebeca testified that Dickinson struck her with the bat approximately forty-three times in her head, thighs, leg, hands, arms, shoulders, and back, while repeatedly asking her, "are you dead yet?" Additionally, testimony was heard that she was *Page 19 
beaten to the point of unconsciousness and sustained a gash to her head, loss of blood, and multiple fractures to her arms and hands. On these facts, we find that the State demonstrated that the baseball bat was used as a deadly weapon. See State v. Roberts, 6th Dist. No. 5-04-003,2004-Ohio-6468, ¶ 12-13; State v. Green, 8th Dist. No. 81232, 2003-Ohio-1722, ¶ 34; State v. McCoy, 10th Dist. No. 99-AP-969,2000 WL 796579; State v. Acevedo, 11th Dist. No. 2002-A-0109, 2005-Ohio-3267, ¶ 25
(finding that "a baseball bat, when used as a weapon, can be a deadly weapon").
 {¶ 41} Finally, Dickinson argues that the State failed to prove that Rebeca was restrained of her liberty and that the circumstances of the alleged restraint caused her physical harm or a substantial risk of serious physical harm. However, Rebeca testified that she tried to escape out the back door during the beating, but that Dickinson struck her in the back of the head and threatened to kill her if she left; that Dickinson continued to beat her to the point of unconsciousness; and, that his restraint prevented her from leaving the trailer and from seeking medical care for her multiple, serious injuries and loss of blood for several days. On these facts, we find that the State presented sufficient evidence that Dickinson restrained Rebeca of her liberty, the circumstances of which caused her very serious physical harm.
 {¶ 42} Accordingly, we overrule Dickinson's fourth assignment of error. *Page 20 
 Assignment of Error No. V {¶ 43} In his fifth assignment of error, Dickinson argues that the jury verdicts were against the manifest weight of the evidence. Specifically, he contends that the State provided no evidence other than Rebeca's testimony that her injuries were not sustained before he picked her up; that Rebeca's story that he beat her with a baseball bat was not credible; and, that the admission of improper evidence demonstrates that the jury lost its way.
 {¶ 44} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.
 {¶ 45} Here, Rebeca testified that she was not injured before going to Dickinson's trailer, and that he caused her injuries by beating her with a baseball bat. Dickinson presented no evidence, other than his own self-serving testimony, to demonstrate that she was injured prior to going to his trailer. Additionally, it is *Page 21 
clear that the jury found Rebeca's version of events to be more credible, and we do not find that the evidence indicates that it clearly lost its way, particularly given that the jury is in the best position to weigh witness credibility. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77. See, also, State v. Keeton, 3d Dist. No. 14-07-48,2008-Ohio-2613, ¶ 32. Finally, although Dickinson complains that improper evidence was admitted, we already determined that such error was harmless.
 {¶ 46} Accordingly, we overrule Dickinson's fifth assignment of error.
 Assignment of Error No. VI {¶ 47} In his sixth assignment of error, Dickinson argues that the trial court erred when it imposed a non-minimum prison term. Specifically, he contends that the trial court failed to consider the purposes of felony sentencing and the factors set forth in R.C. 2929.11
and 2929.12 because the trial court sentenced him to a non-minimum term even though he contends that Rebeca facilitated the offense and strongly provoked him, and that he had not previously been convicted of or pleaded guilty to a criminal offense. We disagree.
 {¶ 48} When an appellate court reviews the sentencing decision of a trial court, it must conduct a meaningful review of the sentencing decision. State v. Daughenbaugh, 3d Dist. No. 16-07-07, 2007-Ohio-5774, ¶ 8, citing State v. Carter, 11th Dist. No. 2003-P-0007, 2004-Ohio-1181. A meaningful review means "that *Page 22 
an appellate court hearing an appeal of a felony sentence may modify or vacate the sentence and remand the matter to the trial court for re-sentencing if the court clearly and convincingly finds that the record does not support the sentence or that the sentence is otherwise contrary to law."[2] Daughenbaugh, 2007-Ohio-5774, at ¶ 8, citingCarter, 2004-Ohio-1181, at ¶ 44; R.C. 2953.08(G).
 {¶ 49} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the Supreme Court of Ohio severed portions of Ohio's felony sentencing law after finding them unconstitutional. The Court held that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences."Foster, 2006-Ohio-856, at paragraph seven of the syllabus. Further, the Court stated that "[o]ur remedy does not rewrite the statute, but leaves courts with full discretion to impose a prison term within the basic ranges of R.C. 2929.14(A) based upon a jury verdict or admission of the defendant without the mandated judicial findings [of fact] that Blakely prohibits." Id. at ¶ 102. Additionally, the Court held that "[c]ourts shall consider those portions of the sentencing code that are unaffected by today's decision and impose any *Page 23 
sentence within the appropriate felony range." Id. at ¶ 105.
 {¶ 50} Trial courts are still required to comply with R.C. 2929.11,2929.12, 2929.13, and the unsevered portions of R.C. 2929.14.Foster, 2006-Ohio-856, at ¶ 36. Additionally, R.C. 2929.11 and 2929.12
do not mandate judicial fact-finding; rather, in exercising its discretion, a trial court is merely required to "consider" the purposes of sentencing in R.C. 2929.11 and the statutory guidelines and factors set forth in R.C. 2929.12. Id. at ¶¶ 36-42. See, also, State v.Mathis, 109 Ohio St.3d 54, 2006-Ohio-855, ¶ 38; State v. Roehl, 3d Dist. No. 4-07-10, 2008-Ohio-85; State v. Estep, 3d Dist. No. 9-07-16,2007-Ohio-6713, ¶ 12.
 {¶ 51} Here, the trial court specifically provided in its judgment entry of sentencing that it had considered the record, oral statements, the purposes and principles of sentencing under R.C. 2929.11, and had balanced the factors of seriousness and recidivism under R.C. 2929.12. Therefore, although the trial court was not required to state that it had considered each section of the sentencing statute, pursuant toFoster and Mathis, the record reflects that the trial court properly considered the statutory sentencing factors. Additionally, the prison sentences imposed by the trial court were within the statutory range for the offenses. See R.C. 2929.14(A).
 {¶ 52} Accordingly, we overrule Dickinson's sixth assignment of error. *Page 24 
 {¶ 53} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed
 PRESTON, P.J., concurs.
[1] We note that the indictment states the attempted murder count is a second degree felony; however, R.C. 2923.02(E)(1) clearly provides that attempted murder is a first degree felony.
[2] We note that the Supreme Court of Ohio's recent plurality opinion in State v. Kalish, 120 Ohio St.3d 23, 2008-Ohio-4912, establishes a two-part test utilizing an abuse of discretion standard for appellate review of felony sentencing decisions under R.C. 2953.08(G). While we cite to this Court's precedential clear and convincing review standard adopted by three dissenting Justices in Kalish, we note that our decision in this case would be identical under the Kalish plurality's two part test.