[Cite as *State v. Spivey*, 2013-Ohio-851.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  9-12-27

      v.

BRADEN T. SPIVEY,                      O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 11-CR-243

Judgment Affirmed

Date of Decision:    March 11, 2013

APPEARANCES:

    *Robert C. Nemo* for Appellant

    *Brent W. Yager and Gregory A. Perry*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Braden Spivey, appeals the judgment of the Court of Common Pleas of Marion County convicting him of felonious assault, abduction, domestic violence, and kidnapping and imposing a prison term composed of two consecutive sentences totaling 15 years. On appeal, Spivey argues that the trial court erred in admitting impermissible evidence, entering verdicts that were against the manifest weight of the evidence, and handing down consecutive sentences. Spivey also asserts that he was denied the effective assistance of counsel. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On May 26, 2011, the Grand Jury of Marion County indicted Spivey on the following five counts: (1) felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree; (2) abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; (3) domestic violence in violation of R.C. 2929.25(A), a misdemeanor of the first degree; (4) kidnapping in violation of R.C. 2905.01(A)(3), a felony of the first degree; and (5) attempted murder in violation of R.C. 2903.02(2), 2923.02, a felony of the first degree. The indictment arose from an incident during the early morning hours of May 7, 2011 in which Spivey was alleged to have abused Chelsea, his then-live-in girlfriend and the

mother of his child, while he drove his automobile from Morral, Ohio to the Killdeer Plains Wilderness Area.

{¶3} On February 13, 2012, Spivey filed a motion in limine to preclude the State from offering evidence of Spivey's previous criminal record, which included a charge for assault and a disorderly conduct conviction. The trial court did not issue a ruling on the motion.

{¶4} The trial of this matter commenced on February 14, 2012 and continued through February 17, 2012. The following relevant evidence was adduced during the course of the trial.

{¶5} First, Michael Oberdier ("Michael"), Chelsea's father, testified about the purported start of the alleged abuse. At the time of the incident, Spivey and Chelsea lived in Michael's house, which was on South Green Street in Morral, Ohio. Michael said that Spivey's and Chelsea's bedroom was next to his and that he woke up around 12:30 a.m. to the sound of a "real heavy gasping sound, like somebody that couldn't breathe." Trial Tr., p. 185. When Michael went to their bedroom to see what was going on, he saw Spivey pacing and Chelsea was facing towards the opposite wall. Michael asked if everything was okay, to which Spivey responded that the couple was dealing with a problem. Michael further testified that based on his observations of Spivey's demeanor, he believed that Spivey was angry at that time. After Michael's short discussion with Spivey and Chelsea, he

noticed that the couple left the house in Spivey's automobile, which was a green Dodge Neon.

{¶6} On cross-examination, Spivey's trial counsel attempted to elicit testimony that Michael had kicked Chelsea and Spivey out of his house at that time. Michael responded by saying that he had kicked the couple out of the house on a previous occasion. After denying twice that he kicked Spivey and Chelsea out on May 7, 2011, the following exchange occurred:

> Q: Again, sir, if both Chelsea and [Spivey] in their sworn statements to law enforcement said you threw them out of the house that night, they would be wrong, right?
>
> A: Could be. Sir, we had incident there approximately a month before that over pot.
>
> Q: Sir, I didn't ask you a question, number one, and number two, I'm talking about this night.
>
> A: I should be able to explain my answer without anything misleading to the other direction. Trial Tr., p. 138.

At this point in the questioning, the trial court sustained an objection of Spivey's trial counsel.

{¶7} On redirect examination, Michael further testified about his actions on May 7, 2011, as follows:

> Q: [Michael], have [sic] there been a time in the past when Chelsea and [Spivey] were living with you and when you did ask them to leave the house?
>
> A: Yes, approximately a month before that.

-4-

Q:    Do you recall what the circumstances were?

[Spivey's trial counsel]:    I'm going to object to relevance, Your Honor.

[Trial court]: Overruled.

Mr. Perry:    You may answer.

A:    We had an issue over pot, which I asked [Spivey] to never have in my home.  I come [sic] home from work one night –

[Spivey's trial counsel]:    I'm going to object, Your Honor.

[Trial court]: I'll go ahead and sustain it.  Trial Tr., p. 139.

{¶8} Richard Holycross testified regarding his interaction with Chelsea and Spivey outside of his house on Morral-Kirkpatrick Road West in Morral.  At approximately 1:00 a.m., Holycross heard a female voice calling for help so he went outside where he saw a green car in the ditch by the road.  He asked if everybody was okay, "[a]nd the gentleman replied, stay away, this is none of your business, just back off."  Trial Tr., p. 175.  Holycross also testified that he heard arguing and a female voice say that her head hurt, that she could not see, and that she did not want to drive.  He then observed the male lead the female to the driver's side of the car.  After the female was in the car, the male pushed it out of the ditch.  Once the car was out of the ditch, Holycross said that he saw the male run around to the passenger side and jump in.

Case No. 9-12-27

{¶9} Lori Bradley then testified regarding her observations on May 7, 2011. At that time, Bradley lived on State Route 67 in Hardin County. Around 1:30 a.m., Bradley heard a knock on her door and a female voice screaming. She testified as follows regarding the scene: "As my husband and I were both going back towards the front door, I could make out more of what she was saying because the screams were getting louder. And she stated, please, help me, he's trying to kill me." Trial Tr., p. 148. The person at the door was Chelsea, who had blood all over her face, scratches across her chest, and a ripped tank top. Bradley testified that Chelsea said her boyfriend had beaten her and that she needed emergency help. Bradley also said that Chelsea was driving a green Neon when she arrived at her house. Bradley also said that she had no reason to suspect that Chelsea was fabricating her story. To assist Chelsea, Bradley called 911 and the recording of the call was played for the jury.

{¶10} Chelsea then testified regarding the May 7, 2011 incident. She indicated that Spivey woke her up around midnight by shaking her. After Chelsea awoke, Spivey said that he had read one of Chelsea's text messages, which led him to accuse her of cheating on him with another man. Chelsea testified as follows regarding the events that immediately followed:

> A: Then he grabbed me by my throat, and I kind of went that way, and he was just squeezing my throat really hard. I couldn't breathe, and then he stopped. And then my blank [sic] tank top he almost ripped in half, and then he got up.

-6-

Q: Approximately how long did he have his hand on your neck?

A: I would say 15 to 30 seconds. It wasn't a long time.

Q: Were you having trouble breathing?

A: Yes, I was.

Q: Were you struggling or resisting in any way physically?

A: Yes, I just had my hands on his hand trying to get him off of me. Trial Tr., p. 210.

{¶11} Chelsea then testified that Michael came by her room and asked that both Chelsea and Spivey go to the living room and discuss their argument with him. However, she said that Michael also indicated that they should leave the house, which they did. The following discussion occurred regarding the couple's exit from the house:

Q: Were you concerned about getting into the car?

A: I was, yes.

Q: Did you initially resist getting in the car?

A: Yes.

Q: What changed your mind?

A: He got into the passenger side first – or the driver's side, I'm sorry. I was standing by the passenger side, and he was yelling at me to get in the car. I said, no probably three times. And then he said, come on, I'm not going to hurt you. We just need to ride and talk about things. So that's when I got into the car. Trial Tr., p. 216.

{¶12} According to Chelsea's testimony, Spivey started to abuse her soon after the car ride began on South Green Street and proceeded onto West Neff Street. She said that Spivey banged her head against the window and punched her in the face, which led her to bleed from her nose and mouth. As Spivey turned onto Stauffer Road, Chelsea jumped from the car. Once she was outside of the car, Chelsea said that she called for help. She further indicated that after jumping, Spivey's car swerved into a ditch and that he got out of the car. Chelsea then testified that Spivey tackled her and pushed her back into the car.

{¶13} Chelsea said that she was aware of Holycross's presence at the time that the car was in the ditch, but that she did not speak up out of fear. She also stated that she tried to drive the car away as Spivey pushed the car, but that he was able to catch up and jump in. After driving towards the Killdeer Plains Wildlife Area, Spivey forced Chelsea to stop the car and switch places with him. While they were outside of the car switching seats, Spivey pulled Chelsea's sweater off and hit her in the rib cage, which knocked her wind out.

{¶14} After they got back into the car, Chelsea said that Spivey threatened that he was going to take her to "[his] territory" and drown her. Trial Tr., p. 230. Chelsea also testified that Spivey said he was going to take her to the "deepest, darkest part of the woods and kill [her]" and that "nobody would ever find [her]." Trial Tr., p. 232. She further indicated that while the two drove, she asked Spivey

to stop but that he did not. However, Spivey did eventually stop the car, and when he exited the car, Chelsea moved into the driver's seat and started to drive away. She said that Spivey then jumped onto the hood of the car. But, Chelsea continued to drive, which led Spivey to fall off, and she left him on the road.

{¶15} Chelsea described her injuries and identified several pictures of them for the jury. At one point, the State requested that Chelsea show her ear, which has a permanent injury, to the jury. In this process, the assistant prosecuting attorney asked that Chelsea show her "deformed" ear to the jury.

{¶16} On cross-examination, Spivey's trial counsel attempted to elicit testimony regarding Chelsea's purported habit of cutting her wrists. The following relevant exchange occurred:

Q: Have you guys broken up before?

A: Yes.

Q: Have you ever cut your wrists over it?

A: No.

Q: Have you ever cut your wrists?

Mr. Perry:   Objection, Your Honor.

[Trial court]: Sustained. Trial Tr., p. 319.

{¶17} Dr. Christina Tulenko took the stand to discuss Chelsea's treatment in the emergency room at Marion General Hospital on May 7, 2011. Dr. Tulenko

testified that part of her examination requires her to assess the demeanor and injuries of the patients she treats. When she treated Chelsea, Dr. Tulenko observed that she was "absolutely terrified" and "covered with abrasions and swelling." Trial Tr., p. 270. Dr. Tulenko described these abrasions and other injuries in detail, which included a nasal bone fracture, a facial bone fracture, hip hematoma, forearm hematoma, a variety of face, scalp, and neck contusions, and multiple abrasions.

{¶18} When discussing the nature of her interaction with Chelsea, Dr. Tulenko testified as follows:

Q: [The incident] was nine months ago, and you've seen a lot of people in between?

A: Yes, [Chelsea] is definitely a case I will remember.

Q: And why is that?

A: You get a sense of reading people, you know, in the emergency department. And you walk in, and you know, just the assessment, it was one of those moments where sort of your hair stands on end when she is recounting her story, and she was absolutely terrified.

Her injuries were certainly consistent with the story that she was telling. And I know, you know, afterwards we talk about it in the emergency department, you know, the nurses and everything, because you always need a little debriefing. And I know it really did upset everyone. It's one of those things you think, my, gosh, she's lucky that she – Trial Tr., p. 283-84.

At this point in Dr. Tulenko's testimony, the trial court sustained an objection of Spivey's trial counsel. Afterwards, she again testified regarding the nature of Chelsea's injuries and its consistency with an allegation of assault:

> Q: Based on the behaviors that you just testified to and the findings that you made of her injuries, was there anything about your treatment of her that day that would cause you to suspect that she was fabricating this?
>
> A: No, her injuries were consistent with her story. Trial Tr., p. 284-85.

{¶19} Dr. Tulenko also discussed the import of reports made by Emergency Medical Service ("EMS") personnel who treated Chelsea during her ambulance ride to the hospital. According to Dr. Tulenko, EMS personnel make an initial assessment of the patient and summarize it in a document referred to as an "EMS run report" or sheet. Trial Tr., p. 287. She testified that the EMS personnel give the run sheets to hospital personnel upon the patient's arrival and that the run sheets are scanned into the patient's medical records. While Dr. Tulenko testified that the run sheets are helpful to the treatment of patients at the hospital, she also indicated that she does not expect the sheets to contain everything that was reported to the EMS personnel. Spivey's trial counsel objected to the admission of the EMS sheets because he purportedly did not receive them during discovery, but the trial court overruled the objection.

{¶20} Laura Kaiser, a registered nurse at Marion General Hospital, also discussed her treatment of Chelsea on May 7, 2011. Nurse Kaiser testified that she observed petechia in Chelsea's left eye, as well as a variety of abrasions and bruises. She also authenticated several pictures that she took of Chelsea's injuries during her examination. Nurse Kaiser described her examination for strangulation-related injuries as follows:

Q: What is this document?

A: This documents the injuries that is [sic] reported when it's been told that the patient would have been choked or strangled. The majority of people would call it choking.

* * *

Q: And was there a history in this case of there being choking or strangulation?

A: Yes, it was recorded [sic] to me by EMS that patient had been choked prior to arrival. When we're notified of that information, we would complete documentation and include it with our assessment.

* * *

Q: The fact that she has petechia in her left eye, how would that be relevant to strangulation?

[Spivey's trial counsel]: Objection, she's not qualified to answer that question.

Mr. Perry: She is, Your Honor.

[Trial court]: Overruled.

A:   Typically, with strangulation, you have 11 pounds of pressure that is [sic] applied to the neck that cuts off blood flow to the brain. Pressure that is applied for ten seconds can cause a patient to lose consciousness. If a patient – if the pressure is removed within ten seconds, typically, a patient will become more responsive within approximately another ten seconds. However, if that pressure is applied for four minutes, as a little as four minutes, it can cause death.

Q:   Now, how does petechia fit into that?

A:   It just shows that there was pressure and that –

[Spivey's trial counsel]:   Objection, calls for a conclusion.

[Trial court]: Overruled.

Mr. Perry:   Go ahead.

A:   It causes the blood flow and pressure to build up, because the blood is not flowing properly. So it causes pressure, kind of as if you were vomiting. Sometimes when you're vomiting, you're putting a lot of pressure on the head sometimes can cause blood vessels to break in your eye as well. But when that pressure is applied to the neck, it can cause build up of pressure, and you can see bruising to the eye, to the ears. You can sometimes see bruising, petechia, inside the roof of the mouth. Those are all areas that you would look to as stated in this documentation as to the type of injuries that you would find.

Q:   So that is why on your form if you have a history of strangulation, that's one of the things you look for is petechia?

A:   The injuries are consistent with the information that was given to me in the history. Trial Tr., p. 350-53.

{¶21} On cross-examination, Spivey's trial counsel elicited information regarding other possible causes of petechia as follows:

-13-

Q:     Ma'am, petechia can be caused by many things, can it not?

A:     It can.

Q:     It's basically over pressure to the eye, correct?

A:     Well, it can be caused from different things.  It's pressure that possibly build [sic] up and caused a blood vessel to break.

Q:     Someone who sneezes real hard could get petechia directly, correct?

A:     Yes, that's correct.

Q:     How about blunt force trauma, couldn't that cause petechia as well of a head smacking on a pavement, from jumping out of a moving car?

Mr. Perry:     Your Honor, that calls for speculation.

[Spivey's trial counsel]:     I believe he opened the door, Your Honor.

[Trial court]: Sustained.  Trial Tr., p. 356.

**{¶22}** Deputy Branden Kromer of the Wyandot County Sheriff's Office testified to his investigation of this matter.  He initially responded to Bradley's house after Bradley called 911 on behalf of Chelsea.  While there, he examined Spivey's automobile, which he described in the following exchange:

Q:     Okay.  What are you looking at here in [Exhibit] 2L?

A:     That is just the hood and the windshield wiper area.  This windshield wiper is snapped off.

Q:     Why did you think that might be significant to the investigation to take a picture of the broken windshield wiper?

-14-

A:    It appeared to me that someone may have -

[Spivey's trial counsel]:    Objection, as to what is appeared, calls for conclusion and speculation.

[Trial court]: I'll allow it.

Mr. Perry:    Go ahead.

A:    The broken wiper appeared to me that someone could have been hanging on to that while trying to hang on to the car.  Trial Tr., p. 391-92.

{¶23} Deputy Ryan Scheiderer of the Marion County Sheriff's Office also testified to his investigation of this matter.  In particular, he discussed a voluntary interview given by Spivey on May 8, 2011, which was played for the jury.  During the course of the interview, Spivey admitted to hitting Chelsea once and pushing her head against the window while he was driving.  He also acknowledged that he grabbed Chelsea and unintentionally face-planted her while the car was in the ditch outside of Holycross's house.  However, Spivey denied choking her while they were still at Michael's house and he denied ever threatening to kill her.  He also indicated that he was seriously injured when Chelsea ran over him in his car and that he was picked up from the side of the road by his cousin and friend.

{¶24} At one point, Spivey stated that he has no previous assault convictions.  Deputy Scheiderer challenged Spivey's contention and asked about a "2006 assault case."  Spivey explained that he was charged with assault but only

pleaded to disorderly conduct. Spivey's trial counsel objected to playing this portion of the interview.

{¶25} At various points during the State's presentation of its case, Spivey's trial counsel objected to the admission of certain items that he said were not handed over during the discovery process. Specifically, Spivey's trial counsel said he did not receive the EMS sheets included in Chelsea's medical records, a dispatch log from the Wyandot County Sheriff's Office, and Spivey's cell phone that was recovered from the Killdeer Plains Wildlife Area. The State represented that it had handed over the documents and informed Spivey's trial counsel that it had Spivey's cell phone. Further, the trial court gave Spivey's trial counsel time to review the documents and cell phone before they were used at trial.

{¶26} After the State rested, Spivey called two additional police officers to the stand. They had interviewed the two individuals who picked Spivey up after Chelsea drove away. The officers authenticated the individuals' written statements, which merely indicate that they picked Spivey up and that they took him to Hardin Memorial Hospital for the treatment of his injuries. After offering this evidence, Spivey rested.

{¶27} On February 17, 2012, the jury returned guilty verdicts on the felonious assault, abduction, domestic violence, and kidnapping charges. However, it returned a verdict of not guilty on the attempted murder charge.

{¶28} This matter then proceeded to sentencing. On April 19, 2012, the trial court conducted a sentencing hearing in which Spivey stated his remorse for the crimes. After Spivey spoke at the hearing, the trial court stated the following:

> [Q]uite frankly, it was pretty wrenching testimony to hear. I mean, the victim was beaten pretty badly, very badly. And there was a lot of terrorizing going on in this situation.
> I don't know what you were thinking that night. You know, I don't get the impression that you had an entire life of committing criminal stuff. The report is not indicating that. But, man, you were sort of nuts that night from what you were doing, and that is not really excusable. Sentencing Hearing Tr., p. 654.

{¶29} In its judgment entry of sentencing, filed April 23, 2012, the trial court stated that it had "considered the record, oral statements, any victim impact statement and pre-sentence report prepared, as well as the principles and purposes of sentencing under R.C. 2929.11, and the appropriate factors under R.C. 2929.12." (Docket No. 96, p. 1). Based on these considerations, the trial court sentenced Spivey to seven years for his felonious assault conviction and eight years for his kidnapping conviction. Meanwhile, pursuant to the State's election, his convictions for abduction and domestic violence were merged for the purposes of sentencing into his convictions for kidnapping and felonious assault, respectively. The trial court further ordered that the sentences be served consecutively. It stated the following regarding the imposition of consecutive sentences:

The Court finds consecutive sentences [are] necessary to protect the public from future crime and to punish [Spivey], and the sentences are not disproportionate to the seriousness of [Spivey's] conduct and to the danger [Spivey] poses to the public. The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offense. (*Id*. at p. 1-2).

{¶30} Spivey timely appealed the trial court's judgment, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

*Assignment of Error No. II*

**THE TRIAL COURT COMMITTED NUMEROUS EVIDENTIARY ERRORS TO THE PREJUDICE OF APPELLANT.**

*Assignment of Error No. III*

**THE GUILTY VERDICTS OF KIDNAPPING AND FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. IV*

**THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO EIGHT YEARS FOR KIDNAPPING AND SEVEN YEARS FOR FELONIOUS ASSAULT AND RUNNING THE SENTENCES CONSECUTIVELY.**

**{¶31}** Due to the nature of the assignments of error, we elect to address them out of order.

*Assignment of Error No. II*

**{¶32}** In his second assignment of error, Spivey contends that the trial court allowed various items of inadmissible evidence into the record.

*Evidence of Drug Use*

**{¶33}** Spivey first challenges the trial court's admission of Michael's testimony that Spivey had previously used marijuana as contrary to the dictates of Evid.R. 404(B).

**{¶34}** Although Spivey did object to this line of questioning, he did so on the basis of relevance and not impermissible character evidence under Evid.R. 404(B). As a result, he has waived all but plain error in the trial court's admission of this evidence. *See* Evid.R. 103(A) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and * * * a timely objection or motion to strike appears on the record, stating the specific ground of objection * * *."); *State v. Daniels*, 9th Dist. No. 03CA008261, 2004-Ohio-828, ¶ 33 (finding waiver of Evid.R. 803 challenge to evidence on appeal where the defendant objected at trial on the basis of improper authentication); *State v. Sibert*, 98 Ohio App.3d 412, 422 (4th Dist. 1994) (finding waiver of foundation challenge to evidence on appeal where the defendant

objected at trial on a variety of other bases). To have plain error under Crim.R. 52(B), there must be an error that both constitutes an "obvious" defect in the trial proceedings and affects "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. Plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436 (1997); *see State v. Johnson*, 3d Dist. No. 2-98-39 (June 30, 1999).

{¶35} We find guidance from our decision in *State v. Dickinson*, 3d Dist. No. 11-08-08, 2009-Ohio-2099, which similarly involved a defendant's alleged physical abuse of a romantic partner. There, the State adduced evidence that the defendant had previous acts of domestic violence. We found that the admission of this evidence did not amount to plain error because the references to the previous incidents were "very brief and did not include any specific details." *Id*. at ¶ 29. We further noted that the defendant himself referred to the previous incidents in his own testimony. *Id*.

{¶36} Like *Dickinson*, Michael's reference to Spivey's alleged marijuana use was limited. Indeed, the trial court stopped Michael from providing further details regarding Spivey's marijuana use after he simply mentioned that there was "an issue over pot." Trial Tr., p. 139. Based on the limited nature of Michael's

testimony, we are unable to find that the trial court's admission of this evidence affected the outcome of the trial.

**{¶37}** Further, the record suggests that the State did not seek to introduce this evidence to prove bad character on the part of Spivey. The State did not elicit evidence of Spivey's marijuana use during its original examination of Michael. Rather, the State only delved into the issue after Spivey's trial counsel cross-examined Michael regarding his actions in the early morning of May 7, 2011. During cross-examination, Spivey's trial counsel sought to elicit information that Michael had ordered Spivey and Chelsea to leave his house before the alleged abuse. In response, Michael explained that he had ordered the couple to leave on a previous occasion, but not on May 7, 2011. To rehabilitate Michael's credibility and to rebut the suggestion of impropriety made during cross-examination, the State elicited the above testimony from Michael. In light of this, we are unable to find that the admission of Michael's testimony regarding Spivey's alleged marijuana use violated Evid.R. 404(B).

*EMS Run Sheets*

**{¶38}** Spivey also challenges the admission of Dr. Tulenko's testimony regarding the EMS run sheets that are contained in Chelsea's medical records. Specifically, he argues that the run sheets were not records kept in the normal

course of Marion General Hospital's business and thus that their admission violated Evid.R. 803(6).

{¶39} Although Spivey did object to this testimony at trial on the basis that his trial counsel purportedly did not receive the EMS run sheets in discovery, he did not object on the basis that the testimony violated of Evid.R. 803(6). Further, he did not object to the admission of the exhibits containing the EMS run sheets. As a result, Spivey has waived all but plain error. *See* Evid.R. 103(A)(1); *Daniels*, 2004-Ohio-828, at ¶ 33; *Sibert*, 98 Ohio App.3d at 422.

{¶40} Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 802 generally prohibits the admission of hearsay unless the offered hearsay statement is covered by a specific exception. This matter implicates the hearsay exception for records of regularly conducted activities, which provides as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of the business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. Evid.R. 803(6).

**{¶41}** Under Evid.R. 803(6), the proponent of the evidence must show the following: "(1) the records were made at or near the time of the event, (2) the records were kept in the ordinary course of business, and (3) the records were made by a person with knowledge." *Edge v. Fairview Hosp.*, 8th Dist. No. 95215, 2011-Ohio-2148, ¶ 15. Spivey suggests that the second prong of this test is not satisfied here. We find significant guidance from *State v. Flowers*, 9th Dist. No. 25841, 2012-Ohio-3783, on this issue. There, the court considered whether a paramedic's report was admissible pursuant to Evid.R. 803(6). It found that the report was "created in the regular course of diagnosing and treating medical issues" and that it was consequently admissible as part of the victim's medical records. *Id*. at ¶ 27.

**{¶42}** We agree with the Ninth District and apply the reasoning of *Flowers* here. Dr. Tulenko testified that the run sheets were regularly produced by EMS personnel and handed over to the hospital staff upon a patient's arrival for the purpose of diagnosing and treating the patient. This testimony provides the necessary foundation to find that the EMS run sheets were kept in the hospital's regular business. As such, the trial court did not commit plain error in admitting Dr. Tulenko's testimony regarding the EMS sheets.[1]

---

[1] We note that authentication of the EMS sheets has not been challenged.

*Evidence of Spivey's Previous Conviction*

**{¶43}** Spivey claims that the trial court erroneously admitted evidence that he was previously charged with assault and convicted of disorderly conduct. This evidence was provided by Spivey during his voluntary recorded statement to Deputy Schneiderer, which was played for the jury.

**{¶44}** An appellate court reviews the trial court's decision on the admission of evidence for an abuse of discretion. *State v. Heft*, 3d Dist. No. 8-09-08, 2009-Ohio-5908, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 16-18, citing *Black's Law Dictionary* 11 (8th Ed.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle*, 11th Dist. No. 99-L-089 (June 16, 2000), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶45}** Spivey argues that the admission of this evidence violates Evid.R. 609(A), which only allows evidence of a witness's previous convictions under certain circumstances. The rule does not provide for the admission of evidence relating to the witness's previous misdemeanor convictions (unless the crime involved dishonesty or false statement) or previous charges on which the witness

was not convicted. Evid.R. 609(A)(2), (3). Further, even if the witness's previous conviction is admissible for the purpose of attacking credibility, the only method to introduce the evidence is "by the *testimony* of the witness on direct or cross-examination, or by public record shown to the witness *during his or her examination*." (Emphasis added.) Evid.R. 609(F).

**{¶46}** Here, the evidence adduced in the police statement was that Spivey was previously *charged* with assault and *convicted* of disorderly conduct, a misdemeanor. As a result, Spivey's conviction and charge were not properly admissible under Evid.R. 609(A). Further, Spivey did not testify at trial, meaning that the evidence of his conviction and charge could not be properly admitted to impeach his credibility pursuant to Evid.R. 609(F). Based on this, we find that the admission of evidence relating to Spivey's criminal record was improper under Evid.R. 609.

**{¶47}** Although the admission of this evidence was improper under Evid.R. 609, we find that the error was harmless. The jury heard a variety of testimony relating to his alleged abuse of Chelsea. It also saw the graphic pictures of Chelsea's injuries, her medical records, and her blood-stained clothes. In light of this overwhelming evidence, we are unable to find that the trial court's erroneous admission of a short discussion relating to Spivey's criminal history changed the outcome of the trial. *See State v. May*, 3d Dist. No. 8-11-19, 2012-Ohio-5128, ¶

77 (finding that the admission of evidence relating to the defendant's previous conviction and charge was not prejudicial where the evidence came from the defendant's short statement that was not referenced during the rest of the trial). As a result, we find no reversible error in the trial court's admission of Spivey's previous assault charge and disorderly conduct conviction.

*Purported Speculative Evidence*

**{¶48}** Spivey argues that the following evidence was impermissibly speculative: (1) Michael's testimony that Spivey was angry before he left the house with Chelsea; (2) Dr. Tulenko's testimony that she expects EMS personnel would not necessarily share everything a patient reported to them; and (3) Deputy Kromer's testimony that the appearance of the windshield wiper on Spivey's automobile suggested that someone was hanging off of it.

**{¶49}** These items of purportedly speculative evidence concern Evid.R. 701. The rule limits lay opinion testimony to "those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701.

**{¶50}** All of these testimonies fall within the confines of Evid.R. 701. Michael testified that he believed Spivey was angry based on his observations of Spivey that night and his familiarity with Spivey. Further, the testimony was

helpful to the jurors because it provided evidence of Spivey's mental state when he was alleged to have begun the physical abuse of Chelsea. As a result, we find no error in the admission of Michael's testimony.

{¶51} Meanwhile, Dr. Tulenko testified about her experience as a physician at Marion General Hospital and the process by which information from EMS personnel is received. Based on her personal knowledge of this process, Dr. Tulenko testified that EMS personnel do not necessarily pass along all the information that they receive from a patient. This statement provided a clearer understanding of Dr. Tulenko's overall testimony regarding what Chelsea reported to her and how that compared with her reports to the EMS personnel. Consequently, we find no error in the trial court's admission of Dr. Tulenko's testimony.

{¶52} As to Deputy Kromer's testimony about the windshield wiper, he indicated that he has investigatory experience and that he personally observed Spivey's automobile when it was parked at Bradley's house. Due to this experience and personal observation, he rationally concluded that the windshield wiper appeared as though someone had been hanging off of it. This testimony was helpful to the jurors in determining whether Spivey indeed jumped onto the hood of the automobile when Chelsea started to drive. Accordingly, we find no error in the trial court's admission of Deputy Kromer's testimony.

*Nurse Kaiser's Opinion Testimony*

**{¶53}** Spivey contends that Nurse Kaiser's testimony regarding Chelsea's petechia and purported strangulation was impermissible opinion testimony.

**{¶54}** Spivey misapprehends this colloquy as including opinion testimony by Nurse Kaiser that implicates Evid.R. 702. A thorough review of the testimony reveals that Nurse Kaiser simply discussed the medical records she created during her examination of Chelsea after she came to the hospital. In the course of this discussion, Nurse Kaiser explained what petechia was and that she was looking for signs of petechia during the examination because Chelsea reported having been strangled. Indeed, Nurse Kaiser did not express an opinion as to whether Chelsea was strangled. She merely indicated that the injuries she observed were consistent with strangulation, as well as other possible conditions, such as vomiting. Consequently, we find that Nurse Kaiser's testimony did not invoke Evid.R. 702 and that the trial court did not err in admitting it.

*Cross-Examination of Nurse Kaiser Regarding Petechia*

**{¶55}** Spivey also complains that the trial court erroneously precluded his trial counsel from cross-examining Nurse Kaiser regarding the causes of petechia.[2]

**{¶56}** We review a trial court's order pursuant to Evid.R. 611 for an abuse of discretion. *State v. Watson*, 3d Dist. No. 14-09-01, 2009-Ohio-6713, ¶ 41.

---

[2] We note that Spivey has not cited any authority that supports his argument on this issue, which violates App.R. 16(A)(7). However, in the interests of justice, we elect to address the merits of his contention.

Under Evid.R. 611(A), the trial court is empowered to control the presentation of evidence, including the "mode and order of interrogating witnesses * * * so as to (1) make the interrogation * * * effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." When exercising discretion under Evid.R. 611, the trial court should be mindful that cross-examination is allowable "on all relevant matters and matters affecting credibility." Evid.R. 611(B).

{¶57} Based on its subject matter, Evid.R. 611's dictates also implicate Confrontation Clause concerns. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Among the most vital rights guaranteed under this clause is the right of criminal defenses to cross-examine witnesses at trial. *Cruz v. New York*, 481 U.S. 186, 189, 107 S.Ct. 1714 (1987). While "the Sixth Amendment guarantees an opportunity for effective cross-examination," it does not require trial courts to allow "cross-examination in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292 (1985); *see also State v. Freeman*, 7th Dist. No. 07 JE 5, 2008-Ohio-2925, ¶ 11 ("[A] criminal defendant's right to confront and cross-examine a witness is not unlimited."). "Rather, a trial court retains wide latitude under the Confrontation Clause to impose reasonable

limits on cross-examination" resulting from considerations of "harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant." *State v. Williams*, 7th Dist. No. 09 MA 11, 2010-Ohio-3279, ¶ 18, citing *Delaware v. Van Ardsall*, 475 U.S. 673, 679, 106 S.Ct. 1431 (1986).

{¶58} A review of the above exchange establishes that the trial court's limitation of the cross-examination was proper under both Evid.R. 611 and the Confrontation Clause. Spivey's trial counsel had already elicited testimony from Nurse Kaiser that petechia is caused by a variety of things beside strangulation. Indeed, the trial court allowed three questions and it was not until the fourth question that the trial counsel sustained an objection to the scope of the cross-examination on petechia. In light of this, we cannot find that the trial court abused its discretion in sustaining the State's objection to the repetitive questioning about petechia.

*Cross-Examination of Chelsea Regarding Alleged "Cutting"*

{¶59} Spivey also contends that the trial court erred in precluding his trial counsel from cross-examining Chelsea regarding her purported habit of cutting her wrists. He claims that such evidence is relevant to Chelsea's credibility. Regardless of this evidence's relevance, Spivey has not demonstrated prejudice from the trial court's ruling. Before the ruling, Chelsea testified that she had not

cut herself due to the status of her relationship with Spivey. Further, Spivey's trial counsel did not proffer any other testimony to the effect that Chelsea had a history of cutting herself. Without such evidence in the record, we are unable to assess the potential prejudice that resulted from the trial court's limitation of the cross-examination. As a result, we find no reversible error in the trial court's ruling. In sum, the trial court's evidentiary rulings at trial do not provide grounds for the reversal of Spivey's conviction.

{¶60} Accordingly, we overrule Spivey's second assignment of error.

*Assignment of Error No. III*

{¶61} In his third assignment of error, Spivey argues that the trial court entered verdicts of felonious assault and kidnapping that were against the manifest weight of the evidence. We disagree.

*Standard of Review*

{¶62} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), superseded by constitutional amendment on other grounds as stated by

*State v. Smith,* 80 Ohio St.3d 89 (1997). Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id.*

*Felonious Assault*

{¶63} R.C. 2903.11(A)(1) provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." A person is deemed to have acted "knowingly" where "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Further, "serious physical harm" is defined as any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolong psychiatric treatment;
>
> (b) Any physical harm that causes a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain. R.C. 2901.01(A)(5).

{¶64} The State offered overwhelming evidence to establish the elements of felonious assault. Most notably, Chelsea testified that Spivey choked her, punched her face, smashed her head into the window of his car, and violently

pulled on her hair and ears. Further, she said that after she jumped out of Spivey's car, he tackled her before pushing her back into the car, where he physically abused her again. Chelsea indicated that from this abuse, she sustained significant injuries from Spivey's actions, including a broken bone, scratches, bruises, and a permanently disfigured ear.

**{¶65}** Meanwhile, documentary and physical evidence, as well as the testimonies of Bradley, Holycross, Michael, Dr. Tulenko, and Nurse Kaiser, tended to bolster Chelsea's allegations during her testimony. The jury saw Chelsea's medical records and the torn undershirt and bloody sweatshirt that she was wearing at the time of the abuse. Further, the jury heard the 911 call by Bradley and the recorded police statement of Spivey in which he admitted to hitting Chelsea.

**{¶66}** Based on the foregoing, we find that the jury's guilty verdict on the felonious assault charge was not against the manifest weight of the evidence.

*Kidnapping*

**{¶67}** R.C. 2905.01(A)(3) provides that "[n]o person by force, threat, or deception * * * shall remove another person from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim * * *."

{¶68} Again, the State offered overwhelming evidence that establish the elements of kidnapping. Chelsea testified that she jumped out of Spivey's car and that after doing so, he got out of the car, tackled her and pushed her back in. She then indicated that once they were back in the car and driving, Spivey continued to physically abuse her, threatened to kill her, and kept driving into the Killdeer Plains Wildlife Area even though she asked that he stop. Further, the testimony by Holycross that he heard a woman scream for help and saw Spivey lead Chelsea to the car corroborates Chelsea's allegations regarding the alleged kidnapping.

{¶69} In light of this, we find that the jury's guilty verdict on the kidnapping charge was not against the manifest weight of the evidence.

{¶70} Accordingly, we overrule Spivey's third assignment of error.

*Assignment of Error No. I*

{¶71} In his first assignment of error, Spivey asserts that he was denied the effective assistance of counsel. The grounds for Spivey's ineffective assistance of counsel are that his trial counsel failed to do the following: (1) request that the trial court issue a ruling on his motion in limine to exclude evidence of his criminal record; (2) view evidence disclosed through discovery before trial; (3) subpoena potentially favorable witnesses; and (4) object to purportedly inadmissible evidence. We disagree and find that any purported deficiencies in trial counsel's performance were harmless.

*Ineffective Assistance Standard*

**{¶72}** An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id*. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), superseded by constitutional amendment on other grounds as recognized by *State v. Smith*, 80 Ohio St.3d 89, 103 (1997). Further, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone*, 2d Dist. No. 10564 (Dec. 13, 1989). "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" *Id*., quoting *Smith v. Murray*, 477 U.S. 527, 535, 106 S.Ct. 2661 (1986).

*Counsel's Handling of Evidence Regarding*
*Spivey's Criminal Record*

**{¶73}** In *State v. Leslie*, 14 Ohio App.3d 343 (2d Dist. 1984), the court

provided the following succinct description of the effect and nature of a motion in

limine:

> Generally, a motion in limine is a pretrial request to the trial court
> for a precautionary instruction to avoid error or prejudice by limiting
> the examination of witnesses in specified areas until the
> admissibility of certain evidence is determined by the court. A trial
> court may or may not rule upon such a motion prior to trial. If a trial
> court does rule upon the motion prior to trial, such a liminal order is
> to be effective only until the admissibility of the evidence is resolved
> at the appropriate time when the court is required to make its ruling.
> *Id*. at 344.

Based on the court's description in *Leslie*, the failure of Spivey's trial counsel to

obtain a liminal order does not reflect ineffective performance on his part. The

record reflects that Spivey's trial counsel filed a motion in limine to exclude

evidence of his criminal record, but that the trial court exercised its discretion to

not hand down a ruling on the motion. Even if the trial court had provided a ruling

on the motion, the order would merely have been liminal in nature.

**{¶74}** Further, the record shows that during the course of the trial, Spivey's

trial counsel objected to the evidence of Spivey's criminal record at the

appropriate time. Based on this, we find no flaw in trial counsel's performance in

this regard. Additionally, had trial counsel's performance been flawed, we would

still find that it did not rise to the level of ineffective assistance of counsel because

the evidence of Spivey's criminal record had no prejudicial effect on the outcome of the trial, as discussed above.

*Counsel's Failure to Review Discovery*

**{¶75}** Trial counsel's alleged unfamiliarity with certain items of evidence suggests deficient performance, but it does not rise to the level of ineffective assistance of counsel. A review of the record reveals that the unfamiliar items to trial counsel were ancillary to the overall case. Further, trial counsel was provided the opportunity to review the items at trial before the State elicited testimony regarding them. Based on the limited nature of these items of evidence, we cannot find that but for trial counsel's performance in this regard, the outcome of the trial would have been different.

*Counsel's Failure to Subpoena Favorable Witnesses*

**{¶76}** Spivey argues that his trial counsel's failure to subpoena the two persons who picked him up on the morning of May 7, 2011 constitutes ineffective assistance of counsel. But, there is little indication that these persons would have been able to provide exculpatory information. Indeed, the only possible admissible testimony that they could have provided was the fact that they picked Spivey up in the Killdeer Plains Wildlife Area around the time of the incident. This testimony could actually suggest Spivey's guilt on the charges since it places him near the scene of the crime. Further, the police statements provided by the

potential witnesses were entered into evidence. Consequently, we find that Spivey's trial counsel was not ineffective when he failed to subpoena these potential witnesses.

*Counsel's Failure to Object to Hearsay*

**{¶77}** Spivey identifies his trial counsel's failure to object to the following items of evidence as indicating ineffective assistance of counsel: (1) Chelsea's testimony regarding the text message she received before Spivey began to physically abuse her and the statements of those who observed her after the alleged beating; (2) the EMS run sheets; and (3) Nurse Kaiser's testimony regarding the EMS sheets.

**{¶78}** In regard to Chelsea's testimony about the text message she received, a review of the testimony indicates that it did not include hearsay evidence. The text message contents were not offered to prove the truth of the matter asserted. Rather, Chelsea discussed the text message to describe the timeline of the incident and Spivey's motive for his actions. Since the testimony was not hearsay, trial counsel's failure to object to it was not deficient.

**{¶79}** As to Chelsea's testimony that those who came into contact with her on May 7, 2011 expressed shock and concern about her injuries, the testimony was not offered to prove the truth of the content of the exclamations. Further, Spivey's

trial counsel objected to some of this testimony, suggesting that his performance was not deficient.

**{¶80}** In regard to the EMS sheets, they were properly admissible, as discussed above. Accordingly, the failure of trial counsel to object to their admission or Nurse Kaiser's testimony regarding them was not ineffective.

*Counsel's Failure to Object to Speculative Testimony*

**{¶81}** Spivey identifies several items of purportedly speculative testimony to which he argues his trial counsel should have objected. After a review of the identified testimony, however, we find that counsel's failure to object was not ineffective.

**{¶82}** Spivey's first identifies the following testimony from Bradley as speculative: "we thought, my husband and I, that whoever had attacked her was right outside as hysterical as she was." Trial Tr., p. 149. Spivey is correct in identifying Bradley's testimony regarding the thoughts of her husband as speculative since no foundation was laid as to how Bradley could have known those thoughts. However, Spivey is unable to show how the failure of his trial counsel to object to this testimony affected the outcome of the trial. Even if the testimony regarding her husband's thoughts was excluded, the jury would still hear Bradley's testimony that she believed Chelsea's assailant was outside of the house. Further, there is no indication that this testimony affects the import of the

other evidence in the record establishing the elements of felonious assault, abduction, domestic violence, and kidnapping. Consequently, counsel's performance in this regard was not ineffective.

{¶83} Spivey also complains of Chelsea's testimony that Michael was unable to see the front of her body during his conversation with Spivey. However, a review of this testimony reveals that it was not speculative. Chelsea, who was present during the conversation, testified that based on her positioning in the room and on the bed, Michael would be unable to see the front of her from his vantage point. As such, this testimony was based on Chelsea's personal knowledge and Spivey's trial counsel had no basis to object to it.

{¶84} Finally, Spivey identifies two portions of Deputy Hoy's testimony as speculative. The first portion relates to Deputy Hoy's observation of brake marks on the road that Spivey and Chelsea traveled. Some portions of this testimony was speculative, such as Deputy Hoy's testimony that the brake marks he observed indicated there was an argument in their vicinity. There is little foundation for such a statement and Spivey's trial counsel could have objected. Nevertheless, there is no indication that this testimony affected the outcome of the trial. The jury still would have heard Deputy Hoy's testimony regarding the existence of the brake marks, which tended to corroborate Chelsea's testimony regarding the events of the car ride with Spivey. As such, the failure of Spivey's trial counsel to

object to the testimony does not rise to the level of ineffective assistance of counsel.

**{¶85}** The second portion of Deputy Hoy's testimony identified as speculative relates to his description of his conversations with several witnesses at the hospital, which were recorded and played for the jury. At one point in the recording, Deputy Hoy was in Chelsea's hospital room and her heart monitor went off. This led a nurse to reprimand Deputy Hoy for getting Chelsea too excited. Since Deputy Hoy's testimony related to his personal observation of Chelsea's vitals and the nurse's reprimand, we are unable to find that it was speculative. Further, even if it was speculative, this evidence had little effect on the trial. As such, counsel's failure to object to the testimony was not ineffective.

**{¶86}** In sum, the failure of Spivey's trial counsel to object to Bradley's, Chelsea's, and Deputy Hoy's purportedly speculative testimony does not constitute ineffective assistance of counsel.

*Counsel's Failure to Object to Irrelevant
and Unfairly Prejudicial Testimony*

**{¶87}** Spivey also argues that his trial counsel was ineffective in failing to object to the following evidence that was either irrelevant or unfairly prejudicial: (1) Dr. Tulenko's testimony regarding Chelsea's injuries and state of mind during her medical examination; and (2) Deputy Scheiderer's testimony regarding paternity testing and child custody matters.

{¶88} Evid.R. 402 provides that relevant evidence is generally admissible unless the Rules of Evidence or other law provides otherwise. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even if evidence is relevant under Evid.R. 401, it is nevertheless inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶89} Dr. Tulenko's testimony regarding Chelsea's injuries was relevant to this matter because it helped the jury to determine whether the element of serious physical harm to Chelsea existed. Further, the probative value of the testimony was not outweighed by unfair prejudice since Dr. Tulenko had personally observed Chelsea and treated her for those injuries. As a result, Spivey's trial counsel was not ineffective in failing to object to this testimony.

{¶90} However, Dr. Tulenko's testimony about Chelsea's state of mind during the medical examination was of questionable relevance. Even if the testimony was irrelevant, the failure of Spivey's trial counsel to object does not rise to the level of ineffective assistance. As noted above, the State offered overwhelming evidence to prove the charges alleged in the indictment.

{¶91} Deputy Scheiderer's testimony regarding paternity testing was indeed irrelevant to this matter and trial counsel could have objected to it. However, trial counsel's failure to object did nothing to change the outcome of the trial. The jury had already heard both Michael and Chelsea testify that Spivey was the father of Chelsea's child. It also heard, as discussed above, an overwhelming amount of evidence that established the elements of kidnapping and felonious assault. As a result, no prejudice resulted from Deputy Scheiderer's testimony.

*Counsel's Failure to Object to Opinion Testimony*

{¶92} Spivey claims that his trial counsel was ineffective because he did not object to the opinion testimony of Dr. Tulenko and Nurse Kaiser regarding the veracity of Chelsea's report of assault before her medical treatment. However, a review of their testimonies reveals that both personally examined Chelsea and based on both their examinations and their medical experience, they concluded that Chelsea's injuries were consistent with her report of assault. This was not impermissible opinion testimony and Spivey's trial counsel was not ineffective in failing to object to it.

*Counsel's Failure to Object to Prosecutorial Misconduct*

{¶93} Spivey finally suggests that his trial counsel was ineffective in failing to object to prosecutorial misconduct. Specifically, he suggests that the

prosecutor's use of "deformed" when referring to Chelsea's ear was prosecutorial misconduct.

{¶94} The test for prosecutorial misconduct is "whether [the prosecutor's remarks] prejudicially affected substantial rights of the accused." *State v. Lott*, 51 Ohio St.3d 160, 165 (1990). The mere use of the word "deformed" does not rise to this level of misconduct, as Spivey suggests. Before the prosecutor's use of this term, Chelsea had testified to the significant injuries she had suffered, including to her ear. As a result, the failure to object to the use of "deformed" does not constitute ineffective assistance of counsel.

{¶95} Accordingly, we overrule Spivey's first assignment of error.

*Assignment of Error No. IV*

{¶96} In his fourth assignment of error, Spivey argues that the trial court erred in handing down a 15-year prison term composed of consecutive sentences. We disagree.

*Standard of Review*

{¶97} "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record or otherwise contrary to law." *State v. Barrera*, 3d Dist. No. 12-12-01, 2012-Ohio-3196, ¶ 20. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as

to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's dangerousness and to ascertain the effect of the crimes on the victims.'" *State v. Watkins*, 3d Dist. No. 2-04-08, 2004-Ohio-4809, ¶ 16, quoting *State v. Jones*, 93 Ohio St.3d 391, 400 (2001).

*Length of Imposed Sentences*

{¶98} R.C. Chapter 2929 governs sentencing. When sentencing a felony offender, the trial court must consider R.C. 2929.11, which sets forth the overriding purposes of felony sentencing, providing, in relevant part, as follows:

> (A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.
>
> (B) A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

The trial court must also consider the factors set forth under R.C. 2929.12(B), (C), (D), and (E) relating to the seriousness of the offender's conduct and the likelihood of the offender's recidivism, *State v. Hartley,* 3d Dist. No. 14-11-29, 2012-Ohio-4108, ¶ 31, and "may consider any other factors that are relevant to achieving the purposes and principles of sentencing," *State v. Heisler*, 3d Dist. Nos. 4-11-14, 4-11-15, 4-11-16, 4-11-17, 2012-Ohio-1277, ¶ 25.

{¶99} Here, the trial court indicated that it considered all of the following items when sentencing Spivey: "the record, oral statements, any victim impact statement and pre-sentence report prepared, as well as the purposes and principles of sentencing under R.C. 2929.11, and the appropriate factors under R.C. 2929.12." (Docket No. 169, p.1). Additionally, it imposed sentences which were within the statutory ranges for kidnapping and felonious assault under former R.C. 2929.14(A)(1), (2). Based on this, we reject Spivey's argument that the trial court failed to properly weigh the necessary statutory factors and consequently produced sentences of inappropriate lengths.

*Consecutive Sentences*

{¶100} R.C. 2929.14(C) governs the imposition of consecutive sentences and provides, in pertinent part, as follows:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to

-46-

punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court finds any of the following:

* * *

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of the course of conduct adequately reflects the seriousness of the officer's conduct.

{¶101} Here, the trial court considered R.C. 2929.14(C)(4) and stated its findings in the judgment entry of sentencing as follows:

The Court finds consecutive sentences [are] necessary to protect the public from future crime and to punish [Spivey], and the sentences are not disproportionate to the seriousness of [Spivey's] conduct and to the danger [Spivey] poses to the public. The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offense. (Docket No. 96, p. 1-2).

The record supports these findings. According to the evidence presented, Spivey's convictions arose from an approximately 20-minute period of time in which he seriously beat Chelsea. She suffered significant injuries, including a broken nose, a disfigured ear, and a variety of abrasions. Further, according to Chelsea's testimony, Spivey threatened to kill her and leave her body in a place where it would be left undiscovered. Based on this, we do not find that the trial court erred in ordering that Spivey serve his sentences consecutively.

{¶102} Accordingly, we overrule Spivey's fourth assignment of error.

{¶103} Having found no error prejudicial to Spivey, in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**