[Cite as *State v. Mead*, 2021-Ohio-1107.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-190604 |
| | | C-190620 |
| Plainitff-Appellee, | : | C-190621 |
| | | C-190622 |
| vs. | | C-190623 |
| | : | C-190624 |
| SCOTT MEAD, | | C-190625 |
| | : | TRIAL NOS. 18CRB-5108 |
| Defendant-Appellant. | | C-19CRB-11671B |
| | : | C-19CRB-23990 |
| | | C-19CRB-23869 |
| | : | C-19CRB-23677 |
| | | C-19CRB-23374A |
| | : | C-19CRB-22922 |
| | : | *O P I N I O N.* |

Criminal Appeals From: Hamilton County Municipal Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: April 2, 2021

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Adam Tieger*, Assistant Prosecuting Attorney, for Plaintiff-Appellee State of Ohio, Hamilton County.

*Andrew W. Garth*, Interim City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Susan M. Zurface*, Assistant Prosecuting Attorney, for Plaintiff-Appellee State of Ohio, City of Cincinnati.

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1} Defendant-appellant Scott Mead appeals from seven municipal court judgments in which he was convicted of domestic violence, telecommunications harassment, violating a protection order, menacing by stalking, and aggravated menacing. For the reasons set forth below, we affirm the judgments of the trial court.

### I. Facts and Procedure

{¶2} Mead and Tonya Luckett were in an on-again/off-again relationship for over a year and a half. The relationship ended in a physical altercation and relentless phone calls, which serve as the bases for the charges in this case.

{¶3} On March 4, 2018, Luckett left work and returned to the home that she shared with Mead. Luckett testified that Mead was drunk and angry. According to Luckett, Mead struck her in the face and knocked her onto the floor. Mead got on top of her and continued to strike her. Mead then grabbed her hair and dragged her through the kitchen. As a result, Luckett claims that she lost control of her bodily functions and sustained several injuries. Photographs taken the following day showed swelling and bruising to her face and arms. Luckett called the police immediately following the altercation and Mead was charged with domestic violence.

{¶4} Five months later, on August 9, 2018, Luckett appeared before the court and said that she did not want to move forward with the case or the pending protection order. Luckett stated that she had reconciled with Mead and that she was hoping to rekindle their relationship. However, the relationship only continued to deteriorate.

{¶5} On August 30, 2018, Luckett received approximately 30 phone calls from Mead. Luckett called the police and Officer Eric Connor responded to the

2

scene. Luckett's phone rang 15 to 20 times in Connor's presence. Connor answered one of the calls, identified himself as a police officer, and explained that he had received a call for harassment. The caller identified himself as "Scott Mead." Connor instructed Mead to stop calling, but the calls continued. Mead was subsequently charged with telecommunications harassment.

{¶6} On September 1, 2018, Luckett again contacted the police regarding incessant phone calls from Mead. Officer Ted Yaeger advised Luckett to file for a civil protection order ("CPO"). Luckett heeded Yaeger's advice and filed for a CPO that same day. Luckett was subsequently granted a temporary protection order.

{¶7} On September 4, 2018, Luckett returned to Yaeger with further complaints of nonstop phone calls from Mead. Mead was subsequently charged with telecommunications harassment. Later that day, Yaeger served Mead with the temporary protection order.

{¶8} On September 7, 2018, Luckett received approximately 40 to 80 phone calls from Mead. Luckett called the police and provided recordings of the phone calls. Mead was subsequently charged with violating a temporary protection order. Two days later, on September 9, 2018, Luckett received an additional 30 phone calls from Mead. Mead was again charged with violating a temporary protection order, as well as menacing by stalking.

{¶9} On May 4, 2019, Luckett received a call from Mead on her employer's public phone line. Luckett's coworker answered the phone and Mead asked to speak to Luckett. Mead immediately started yelling at Luckett and threatened "to kill [her] and put [her] in a black garbage bag." Luckett's employer called the police and Mead was subsequently charged with aggravated menacing.

3

{¶10}  On September 30, 2019, all of the charges were tried together before a jury.  The city of Cincinnati prosecuted Mead on the domestic-violence charge and the Hamilton County Prosecuting Attorney's Office prosecuted Mead on the remaining charges.  Following three days of testimony, the jury found Mead guilty of one count of domestic violence, two counts of telecommunications harassment, two counts of violating a protection order, one count of menacing by stalking, and one count of aggravated menacing.  On October 4, 2019, the trial court sentenced Mead to an aggregate term of 18 months' incarceration.  Mead timely filed this appeal, raising five assignments of error for our review.

## II.  Right to a Fair Trial

{¶11}  In his first assignment of error, Mead argues that his constitutional rights were violated because he was required to wear the same clothes for four consecutive days of trial.

{¶12}  The United States Supreme Court has held that the state cannot compel an accused to stand trial before a jury while dressed in identifiable jail clothes.  *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).  The rule entitling a defendant to be tried in ordinary clothing is designed to preserve the presumption of innocence, a "presumption so basic to the adversary system."  *Id.* at 504.  A defendant's appearance in jail clothing is a constant reminder to the jury that the defendant is in custody, and the constant reminder of the accused's condition may affect a juror's judgment.  *Id.* at 504-505.

{¶13}  It is undisputed that Mead was not compelled to appear in jail clothes. On the first day of trial, Mead wore dress clothes and black dress shoes provided by defense counsel.  On the next three days of trial, Mead wore the same dress clothes and tennis shoes he had been wearing when he was arrested.  The sheriff's office

4

refused to accept any additional clothes or shoes from defense counsel. Mead contends that the presumption of innocence was violated when he was compelled to wear the same clothes throughout his four-day trial.

{¶14} Mead does not cite, and we cannot find, any cases to support his contention. In fact, the only courts to address the issue have ruled against Mead. *See People v. Purscelley,* Cal.App. No. D056288, 2010 WL 2952450 (Jul. 29, 2010) (holding trial court did not violate defendant's constitutional rights by limiting him to one change of ordinary clothing per week); *Johnson v. Sherman*, C.D.Cal. No. 5:17-01860 ODW, 2020 WL 3655494 (May 14, 2020) (holding trial court did not violate defendant's constitutional rights by limiting him to two changes of ordinary clothing per week).

{¶15} There is nothing in the record to suggest that Mead's repeatedly-worn dress clothes were the equivalent of identifiable jail clothes. The trial occurred over a four-day period and Mead wore nondescript dress clothes. In addition, Mead wore two different pairs of shoes during the course of the trial, which is consistent with a person not being incarcerated. Under these circumstances, Mead has not established a violation of his constitutional rights.

{¶16} Mead's first assignment of error is overruled.

### III. Right to a Speedy Trial

{¶17} In his second assignment of error, Mead argues that the 11-month postaccusation delay on his September 10 and September 11 charges violated his constitutional right to a speedy trial.

{¶18} Appellate review of a speedy-trial determination involves mixed questions of fact and law. *State v. Rice*, 2015-Ohio-5481, 57 N.E.3d 84, ¶ 15 (1st Dist.). We give deference to the trial court's factual findings as long as they are

supported by competent, credible evidence, and we review de novo the court's conclusions of law. *Id.*

{¶**19**} To determine whether a defendant has been deprived of his constitutional right to a speedy trial, courts must balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State v. Selvage*, 80 Ohio St.3d 465, 467, 687 N.E.2d 433 (1997).

{¶**20**} The first factor acts as a triggering mechanism for inquiry into the other factors. *Barker* at 530. The United States Supreme Court has explained:

Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

*Id.* at 530-531.

{¶**21**} Courts have generally found postaccusation delays presumptively prejudicial as they approach one year. *See, e.g., State v. Sears*, 166 Ohio App.3d 166, 2005-Ohio-5963, 849 N.E.2d 1060, ¶ 11 (1st Dist.) (9-month delay for misdemeanor assault was presumptively prejudicial); *Selvage* at 468 (ten-month delay for felony drug trafficking was presumptively prejudicial).

{¶22} On September 10, 2018, the Harrison Police Department filed a misdemeanor complaint and issued an arrest warrant against Mead for violating a protection order. On September 11, 2018, the Harrison Police Department filed another misdemeanor complaint and issued another arrest warrant against Mead for menacing by stalking. Mead was not arrested until August 15, 2019, more than 11 months after the issuance of the warrants. This 11-month delay is presumptively prejudicial and triggers inquiry into the remaining factors.

{¶23} The second factor operates on a sliding scale. *State v. Rogers*, 1st Dist. Hamilton No. C-180120, 2019-Ohio-1251, ¶ 9. Deliberate dilatory acts are weighted heavily against the state, while negligent acts are weighted less heavily against the state. *Barker,* 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101.

{¶24} Officer Yaeger testified that he never attempted to serve Mead with the September 10 and September 11 charges. The state believed that Mead resided outside the jurisdiction. A review of the record shows that Mead partially resided in California and the state did not have a California address for Mead. Instead, the state had only one address for Mead—his mother's address in Cincinnati. Mead had been served at his mother's address on prior occasions. The state did attempt to serve Mead with other charges on September 7, 2018, but could not locate him at his mother's address. Nonetheless, the state did not attempt to serve Mead with the September 10 and September 11 charges, and there is no evidence that Mead attempted to avoid service. Therefore, the state was not reasonably diligent in pursuing Mead and the second factor weighs slightly in Mead's favor.

{¶25} With respect to the third factor, the parties agree that Mead filed a motion to dismiss on August 22, 2019, one week after his arrest. This factor weighs in favor of Mead.

**{¶26}** Courts should assess the fourth factor in light of the interests which the right to a speedy trial was designed to protect, including (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Barker* at 533.

**{¶27}** The first two interests are not implicated in this case. Mead was not incarcerated in the period between the filing of the complaint and his arrest, and there is no evidence that he suffered anxiety or concern during that period.

**{¶28}** With respect to the last interest, Mead does not allege any particularized trial prejudice. Instead, he argues that the state's negligence created a presumption of prejudice.

**{¶29}** As a general rule, "prejudice may be presumed only in aggravated cases involving excessive delay." *Rogers,* 1st Dist. Hamilton No. C-180120, 2019-Ohio-1251, at ¶ 17. Here, Mead was arrested approximately 11 months after issuance of the arrest warrants and no attempt was made to serve him before then. However, the state alleged it had a problem locating Mead. And a review of the record supports that assertion—Mead partially resided in California, the state did not have a California address for Mead, and Mead could not be located at his mother's address three days earlier. Under these circumstances, the 11-month delay does not rise to the level of an aggravated case involving excessive delay.

**{¶30}** After weighing all of the *Barker* factors, the state's negligence is not enough to outweigh the absence of prejudice. Therefore, Mead was not deprived of his constitutional right to a speedy trial and his second assignment of error is overruled.

### *IV. Evid.R. 901 & 1003*

**{¶31}** In his third assignment of error, Mead argues that the trial court erred by allowing duplicate phone recordings into evidence. Mead contends that the duplicate recordings were not properly authenticated under Evid.R. 901 and 1003.

**{¶32}** The trial court is vested with the sound discretion to admit duplicates, and those rulings will not be overturned absent an abuse of discretion. *State v. Searles*, 1st Dist. Hamilton No. C-180339, 2019-Ohio-3109, ¶ 7; *State v. Tibbetts,* 92 Ohio St.3d 146, 160, 749 N.E.2d 226 (2001).

**{¶33}** Evid.R. 901 governs the authentication of recorded phone conversations. The threshold for authentication is low, and requires only a prima facie showing that "the matter in question is what its proponent claims." Evid.R. 901(A); *State v. Rosemond*, 2019-Ohio-5356, 150 N.E.3d 563, ¶ 59 (1st Dist.); *State v. Crossty*, 2017-Ohio-8382, 99 N.E.3d 1048, ¶ 29 (1st Dist.). Evid.R. 901(B)(5) provides that evidence may be authenticated by voice identification, "whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

**{¶34}** Pursuant to Evid.R. 1003, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." The party seeking to exclude the duplicate has the burden of demonstrating that it should be excluded. *State v. Tibbetts*, 92 Ohio St.3d 146, 160, 749 N.E.2d 226 (2001).

**{¶35}** In this case, the evidence was sufficient to establish that the duplicate recordings were what the state claimed them to be—i.e., accurate recordings of

9

phone calls between Mead and Luckett. Luckett testified that she recorded the phone calls with her friend's iPad and presented them personally to the police department. The police then uploaded the iPad footage onto their system and manually recorded it.

{¶36} Although Luckett had no personal knowledge of the duplicate recordings, she testified that she remembered the calls and that she recognized the voices on the calls. Luckett unequivocally identified her voice and Mead's voice on the recordings. She further testified that the duplicate recordings fairly and accurately represented the phone calls she received on September 7, 2018. Luckett's voice identification was sufficient to constitute a prima facie showing of authenticity. Thus, the trial court did not abuse its discretion in admitting duplicate copies of the phone recordings.

{¶37} Mead's third assignment of error is overruled.

### V.     Evid.R. 404(B)

{¶38} In his fourth assignment of error, Mead argues that the state's introduction of other-acts evidence violated Evid.R. 404(B) and warranted a mistrial.

{¶39} At trial, Mead's theory of the case was that Luckett lodged false allegations against him whenever their relationship was "off-again." During cross-examination, Mead's counsel elicited information that Luckett originally did not want to go forward with the domestic-violence charge and did not want a temporary protection order. To rehabilitate Luckett's credibility and to rebut the implication that Luckett falsified the charge, the state elicited information that Luckett decided to continue with the domestic-violence case due to "constant threats and more hands on." Mead claims that evidence of threats and subsequent instances of domestic violence was inadmissible under Evid.R. 404(B).

10

{¶40} Pursuant to Evid.R. 404(B): "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evidence of other acts is admissible only when it is probative of a nonpropensity-based issue. *State v. Hill*, 1st Dist. Hamilton No. C-190638, 2021-Ohio-294, ¶ 31.

{¶41} In two recent cases, the Ohio Supreme Court clarified the process for determining whether other-acts evidence is admissible at trial. *See State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651; *State v. Smith*, Slip Opinion No. 2020-Ohio-4441. As with all evidence, the threshold question for determining admissibility is whether the evidence is relevant. *Hartman* at ¶ 24. "In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute." *Smith* at ¶ 37, citing *Hartman* at ¶ 26-27. The relevancy of other-acts evidence is a question of law subject to a de novo review. *Hartman* at ¶ 22.

{¶42} If the evidence is relevant to a noncharacter-based issue that is material to the case, then the court must consider whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *Smith* at ¶ 38; *Hartman* at ¶ 29. "Balancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion." *Hartman* at ¶ 30.

{¶43} In this case, the state introduced other-acts evidence to rehabilitate Luckett's credibility and to show her state of mind, not to show Mead's propensity for violence. A review of the record shows that the state did not elicit the other-acts evidence during direct examination of Luckett. Rather, the state addressed the issue

only after Mead's counsel cross-examined Luckett regarding her prior actions with respect to the domestic-violence case.

{¶44} This case hinged on the jury's determination of credibility. Thus, Luckett's credibility was a material issue in dispute. The state introduced the other-acts evidence to rebut the testimony that Luckett originally did not want to pursue the domestic-violence charge and to explain why Luckett delayed in obtaining a protection order. Accordingly, the other-acts evidence was not premised on improper character inferences and was probative of a material issue in the case. *See State v. Spivey*, 3d Dist. Marion No. 9-12-27, 2013-Ohio-851, ¶ 37 (evidence of defendant's prior drug use did not violate Evid.R. 404(B) where it was admitted to rehabilitate the witness's credibility and to rebut the suggestion of impropriety made during cross-examination).

{¶45} The other-acts evidence was also not unfairly prejudicial. On redirect, the trial court allowed Luckett to testify that she changed her mind because of "constant threats and more hands on." The court allowed Luckett to provide some details regarding the threats—e.g., Mead made threats against Luckett, her family members, and her friends. But the court stopped Luckett from referencing other instances of domestic violence. The court sustained defense counsel's objections to "any statement regarding hands being placed on [Luckett] subsequent to the [March 3 incident]." The court also instructed the jury not to consider "any statements that were stricken by the court or that you were instructed to disregard."

{¶46} Furthermore, Luckett's testimony about other acts paled in comparison to her testimony about the charges. Luckett testified that Mead repeatedly struck her in the face, grabbed her hair, and dragged her through the kitchen. Luckett also testified about the countless phone calls that occurred over a

ten-month period. Luckett's testimony was corroborated by photographs of her injuries and duplicate phone recordings.

{¶47} Therefore, the trial court did not err in admitting the other-acts evidence. Mead's fourth assignment of error is overruled.

### VI. Cumulative Error

{¶48} In his fifth assignment of error, Mead argues that the cumulative effect of the first, third, and fourth assignments of error deprived him of a fair trial.

{¶49} Because we have not found any instances of error, we cannot find cumulative error. Accordingly, Mead's fifth assignment of error is overruled.

### V. Conclusion

{¶50} For the foregoing reasons, Mead's assignments of error are overruled and the judgments of the trial court are affirmed.

Judgments affirmed.

**ZAYAS, P.J.,** and **MYERS, J.,** concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.

13